855 A.2d 569 (2004)
372 N.J.Super. 42
In the Matter of the Civil COMMITMENT OF G.G.N., SVP-257-02.
Superior Court of New Jersey, Appellate Division.
Submitted August 17, 2004.
Decided August 20, 2004.
*571 Yvonne Smith Segars, Public Defender, for appellant (Joan Van Pelt, Assistant Deputy Public Defender, of counsel; Jean M. Hartmann, Designated Counsel, on the brief).
Peter C. Harvey, Attorney General of New Jersey, for respondent (Patrick DeAlmeida, Assistant Attorney General, of counsel; Margaret MacGregor and Mary Beth Wood, Deputy Attorneys General, on the brief).
Before Judges STERN, CIANCIA and PARRILLO.
The opinion of the court was delivered by
CIANCIA, J.A.D.
Appellant G.G.N. appeals from a judgment of September 13, 2002, civilly committing him to the Special Treatment Unit under the Sexually Violent Predator Act (SVPA or the Act), N.J.S.A. 30:4-27.24 to -27.38.
On appeal, G.G.N. contends that he was constitutionally entitled to a jury trial; that the standard of proof for commitment must be beyond a reasonable doubt; that the State failed to meet the clear and convincing evidence standard; that hearsay testimony was erroneously relied upon by the hearing court; and that appellant's conversations with state psychiatrists were inadmissible because they were not tape-recorded.
We find merit in G.G.N.'s claim that the State failed to meet its burden of proof and, to a lesser extent, that the court improperly relied upon hearsay evidence. We find insufficient merit in the remaining issues to support reversal.
As to the claim of entitlement to a jury trial, that issue was recently considered by us in In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 845 A.2d 139 (App.Div.2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004). We there found no right to a jury trial under state law. Id. at 606-607, 845 A.2d at 143. We now adhere to that determination.
So too, we find no basis to alter the burden of proof from that which is set out in the statute and which was approved by our Supreme Court in In re Commitment of W.Z., 173 N.J. 109, 130-131, 801 A.2d 205, 217 (2002); accord J.H.M., supra, 367 N.J.Super. at 607, 845 A.2d at 143; N.J.S.A. 30:4-27.32a. The standard of proof is clear and convincing evidence.
*572 We find no basis to require, as a matter of constitutional compulsion, that interviews with state psychiatrists be tape recorded. See State v. Cook, 179 N.J. 533, 559-560, 847 A.2d 530, 545-546 (2004) (declining to mandate the recordation of defendant's statements to police as a matter of due process). Additionally, both psychiatrists who interviewed G.G.N. said they offered to adjourn the interview or cancel it if G.G.N. was uncomfortable giving unrecorded statements. G.G.N. chose to go forward with the interviews.[1]
To compel commitment under the SVPA, the State must prove by clear and convincing evidence that an individual who has been convicted of a sexually violent offense, suffers from a mental abnormality or personality disorder, and presently has serious difficulty controlling harmful sexually violent behavior such that it is highly likely the individual will reoffend. W.Z., supra, 173 N.J. at 120, 132, 801 A.2d 205, 218. Our primary concern in the present instance is with the quality of proof presented by the State in light of its burden of proof and the particular facts.
There is no doubt that G.G.N. committed sexually violent offenses within the definition of the SVPA. He does not contend otherwise. In 1981 he pled guilty to three rapes and to one attempted rape, all occurring within the space of a month. G.G.N. was twenty-one years old at the time. He has also since admitted to a date rape in 1979 and to forced intercourse with two girls when he was in high school. G.G.N. also has convictions for nonsexual offenses such as larceny and possession of stolen property.
In 1981 G.G.N. was evaluated at the Adult Diagnostic and Treatment Center (ADTC) incident to his plea. His conduct was found to be repetitive and compulsive, thus falling under the purview of the New Jersey sex offenders law, N.J.S.A. 2C:47-1 to -10. He was sentenced to the ADTC at Avenel. He was given consecutive sentences aggregating forty years that resulted in a "max out" date of May 20, 2002.
The first six years of G.G.N.'s incarceration were spent in state prison. He was transferred to the ADTC on October 5, 1987. He remained at Avenel for fourteen years. During those fourteen years of treatment he participated in all available therapy programs. At one point he achieved the highest therapeutic status. He advanced to treatment level IV, which is for persons "who have completed most of the work," and was referred to the therapeutic community where there is greater independence and inmates try to help each other. G.G.N. was recommended for parole three or four times, most recently in April 1997. In 1992, Lawrence Turek, a staff clinical psychologist wrote:
It is this therapist's opinion, as well as the Treatment Staff of Panel A, to forward this case to the SCRB for consideration for Parole. We are of the opinion that [G.G.N.] has the necessary insight into himself and the control over his behavior and impulses to warrant consideration for Parole. His progress in treatment is significant. He has good insight into the dynamics of his deviant arousal pattern, has shown genuine empathy and concern for his victims, has demonstrated in his *573 behavior greater self-esteem and confidence in himself, good interpersonal skills, the capacity to express his feelings, emotions, and needs appropriately, and the ability to reach out to others for help and assistance when the need arises. Understanding of himself and judgment is good. It is believed that he can make a successful re-adjustment back into the community with the support structures that will be conditions for his parole and is therefore a minimal risk for recommitting a sexual offense given his psychological and emotional growth to date.
In 1995 the Special Classification Review Board (SCRB) forwarded G.G.N.'s case to the Parole Board for consideration with the comment "[p]rognosis remains good to excellent. Continued inpatient treatment is no longer recommended...."
Yet there developed concern that G.G.N. was "sabotaging his therapeutic gains" by various institutional infractions such as possessing baking soda to brush his teeth, possessing his own social security card, copying a gambling pool form from the newspaper, possessing toilet paper, and attempting to mail "State property" to his parents. The 2001 ADTC termination report prepared by a Dr. Schaupp and a social worker named Laura Totten was concerned with "self-sabotage." The report at one point states:
A persistent pattern of behavior that [G.G.N.] exhibits is self-sabotage, which has, and continues to occur when he appears to make therapeutic gains. His sabotaging behaviors usually result in institutional charges for violations ranging from Refusing to Obey an Order, Out of Place, Using Abusive Language and Possession of Anything not Authorized for Retention/Receipt, to Being in an Unauthorized Area and Stealing, for which he received 5 days detention in 1998. Although [G.G.N.] has been active in the Therapeutic Community and functioned as a coordinator and a member of the Self Help Committee, he had experienced some difficulty and requested to be removed from the community in Spring, 2001 despite treatment staff recommendations that he remain. [G.G.N.] received a charge in 5/01 for Possessing Unauthorized Material and received 5 days detention, which was suspended. As a result, he was removed from 1 Wing and was placed in a Level 3 Process Group in June, 2001. To his credit, [G.G.N.] utilized some group time to examine his behavior and returned to Level 4 and the Therapeutic Community in October. However, as recent as December, 2001 [G.G.N.] received charges for Attempting Unauthorized Use of Equipment and Preparing and Conducting a Gambling Pool and received 15 days detention, loss of commutation time.
....
[G.G.N.] was administered the MnSOST-R and Static-99, which both yielded results that place [G.G.N.] in the high risk category for sexual reoffense. [G.G.N.'s] criminal record, poor institutional adjustment and clinical concerns regarding sincerity and integration of knowledge combined with the scores on the actuarial instruments suggest that screening for civil commitment is warranted. If he is released to the community, participation in sex offender specific aftercare is strongly recommended.
Our problem is that none of this information concerning G.G.N.'s fourteen years of treatment was presented by the State through first-party witnesses. Not one doctor, therapist, or employee of ADTC was called by the State. Instead, the State relied solely on the testimony of two psychiatrists, Dr. Gnassi and Dr. Siegel. The hearing judge in turn made no credibility *574 findings per se, but obviously relied upon the testimony of both psychiatrists presented by the State.
The quality of Dr. Gnassi's testimony is open to question. Gnassi's report states:
On 12/20/01 [G.G.N.] reported to Lawrence A. Siegel, M.D. at the ADTC that he is having compelling urges to Sexually Assault Women. He further reported that anger fuels his Sexual Assaults and when a man is physical, the women [sic] is subservient. He likes the victim to listen to him.
Siegel, on the other hand, denied that G.G.N. ever reported such urges and explained that G.G.N.'s references to anger fueling sexual assaults were historical not current. Gnassi also admitted on cross-examination that that part of his report "seem[ed] to follow along" with the State's petition for commitment and he relied on that petition for other parts of his report.
Gnassi was not a treating doctor. He met G.G.N. for the first time on July 24, 2002, and spent about a half-hour with him. Gnassi spoke to G.G.N. again for a half-hour on the day of the hearing, August 2, 2002.
Gnassi said G.G.N. does not have any signs of psychosis. He shows intellectual remorse but not spontaneous remorse. Gnassi considered the possibility of sadism based upon how the original crimes occurredi.e., G.G.N. talked to the victims and did not "seem to have any empathy for what happened or remorse or spontaneous remorse even there." While acknowledging that G.G.N. has progressed in therapy, Gnassi never really addressed those fourteen years of treatment. He diagnosed G.G.N. with paraphilia NOS based on the crimes committed. The connection to the present day was only achieved by reference to disciplinary infractions in ADTC, infractions which "[i]n all honesty, I don't have the full description of some of these." As to those infractions, the following exchange took place on cross-examination:
Q. Okay. And if it's important to you and important to you in making your opinion, shouldn't you have investigated as to what he actually did and when?
A. I agree with you and I wasn't able to.
When asked why he diagnosed G.G.N. with paraphilia, Gnassi responded, "because they're non-consenting adults who he was involved with, basically." Based on his past record, Gnassi believed G.G.N. has "thoughts and feeling [sic] which continue, is my impression. I think he's improved. I think he has improved at the A.D.T.C. But how to figure out how much he's internalized in terms of control is the problem." Unfortunately, Gnassi had little response to his own rhetorical question. The only linkage he could find between the crimes in 1981 and the present day were G.G.N.'s infractions in the institution. While acknowledging he wasn't entirely sure what those infractions consisted of, and while admitting that they were apparently minor, he nevertheless thought them significant because they occurred. In his view, they show that defendant was self-sabotaging his therapeutic gains.
As to the paraphilia diagnosis, the following exchange is representative:
Q. Your diagnosis of a paraphiliaparaphilia N.O.S., that's based on history, isn't it?
A. Yes.
Q. You're particularly referring I guess to '81 and earlier, right?
A. Yes.
Q. Rapes of '81 and earlier, right. He's not currently demonstrating any behavior that would indicate a paraphilia, right?

*575 A. Well, I don't know the full details of this alleged behavior at the A.D.T.C. where there was alleged sexually acting-out.[2]
When asked if G.G.N. is currently at high risk, Gnassi replied:
I still think he's at high risk in the sense that I would like to see how he does if he were to continue in therapy at the present time, and we see his behavior normalized, what [sic] he doesn't act-out and commit further offenses when he improves in his therapy.
Dr. Siegel, the other psychiatrist testifying for the State, also never treated defendant. As a consultant to ADTC, he was asked to write a termination report. Siegel interviewed G.G.N. on one occasion and spoke with Laura Totten, a social worker at ADTC who was G.G.N.'s therapist for a few months and who helped prepare another termination report. He also reviewed various records and independently scored two actuarials, the MnSOST-R and the Static-99. Siegel diagnosed paraphilia NOS and antisocial personality and found some indication of sexual sadism. As to the latter, he did not have sufficient information "to either say that he does have it or to say that he doesn't." The "indications" were that the rapes seemed "scripted."
When asked why he diagnosed paraphilia NOS, Siegel replied:
Because he has, based upon his history and arousal pattern or sexual stimulation, to an abnormal or a deviant stimulus, which is having sex with people who don't consent, based upon the history.
On cross-examination, Siegel again acknowledged that the paraphilia diagnosis was based on history.
When asked why he gave defendant a diagnosis of antisocial personality disorder, Siegel replied:
Well, I think that as [sic] least as an adult, up until he was arrested, clearly, he had a persistent pattern of breaking the rules of society which is one of the criteria. I think there was also some indication of problems in school orI don't recall exactly, but I had the impression that there was some problems that he had behaviorally when he was a youngster.
And I think that he's also had ongoing rules violations since he's been at A.D.T.C. I believelet me just take a look ... and I think that those were the major factors that I considered.
Siegel's dismissive attitude of fourteen years of treatment is evident in the following testimony:
But, again, it's difficult to tell after someone's been in treatment and has gone through victim empathy courses and learned how victims feel and how, you know, the harm that one causes. So that complicates the evaluation. You know, in such situations one has to rely upon the offenses, themselves, and the pre-arrest thinking as being more indicative of what the individual's character is. It doesn't mean someone can't change, but it's difficult to do.
As to the two actuarial tests, G.G.N. scored high on each, supposedly demonstrating a likelihood of recidivism, but it is hard to tell from the record how much weight the witnesses placed on those tests. More important for present purposes is *576 that those tests primarily deal with historical facts divorced from intervening treatment. The Static-99 has ten categories, each of which relates to pre-conviction data. The coding rules for the test state that "[a]lthough potentially useful, an interview with the offender is not required to score Static-99."
The MnSOST-R test contains sixteen items, twelve of which are historic. The other four are described as institutional/dynamic variables. They deal with disciplinary history while incarcerated, drug use, sex offender treatment, and age of the offender at time of release. The premise is that the higher the score the more likely the offender will recidivate. The highest possible score appears to be 31. G.G.N. scored 20. Of the dynamic items, one point is the highest possible score for "disciplinary history." Thus, disciplinary history constitutes a very small segment of the total score. The dynamic variables in toto can only account for a maximum of 9 out of 31 possible points.
Finally, we come to the elephant in the courtroom that no one wanted to deal with substantively. In one document moved into evidence, a 1996 report, there is the following:
[G.G.N.] has admittedly been sexually involved with several men who are of diminished intellectual capacity. Furthermore, one man confronted [G.G.N.] regarding an issue of force and pressure. This must be seriously examined, in terms of [G.G.N.'s] rape dynamics and refusal to examine therapeutically. These behaviors clearly must be resolved prior to parole consideration.
One might think that when attempting to evaluate the current potential for recidivism that this alleged conduct would have been the center of discussion. Surprisingly, it was not. The State called no one from ADTC to explain the truth or significance of these admissions and accusations. The two doctors testifying for the State gave the whole topic a relatively wide berth.
When Siegel was asked about the 1996 allegation, he said "that didn't play very much in my evaluation. I didn't explore that." At another point in the questioning, Siegel stated, "[t]here was some question about whether he was involved with male inmates who were less than competent. But, again, ... I didn't rely on that or make much of that." G.G.N. was never charged with such an offense.
Gnassi also had very little to say on this topic except to note an alleged report of sexual behavior with other people and the absence of charges. He didn't know "the full details" but thought it was self-reported by G.G.N. Despite this lack of knowledge, Gnassi was willing to say "it points to a lack of control of sexual behavior." Gnassi then acknowledged under questioning that the version of the statements about sexual activity that he had read was actually from yet an earlier report.
Despite the equivocation of the witnesses, the double hearsay nature of the information, and the absence of any substantive admissible evidence, the hearing judge was apparently willing to accept the allegations as fact. When recounting Siegel's testimony, the judge said:
Dr. Siegel's testimony discussed the respondent[']s self-reporting the rape in Virginia and his activities in that regard while in high school. He discussed his questioning of how much was integrated from all of the therapy in view of the recent rules violations. He also points out that he questions it in view of the respondent's sexually acting-out at the A.D.T.C. There were apparently a couple of relationships with intellectually-impaired inmates.
*577 In fact, Siegel was careful not to draw any conclusions from the hearsay allegations of sexual activity.
When summarizing Gnassi's report, the judge said:
When [G.G.N.] admitted that he engaged in sexual relations with others, as well as acquiring charges, these recent acts plus the forceful sexual relationships with regard to his predicate offenses suggest that he has not internalized enough control to prevent himself from acting-out again in a sexual manner.
The hearing judge's opinion contains frequent references to many hearsay documents moved into evidence. It is impossible to tell if those references are only for the purpose of evaluating the credibility of the expert testimony, or if the court was using the information more substantively. The following excerpt is illustrative. After talking about testimony presented on G.G.N.'s behalf by a staff clinical psychologist, Turek, who treated G.G.N. for nine years, the court goes on:
Along the way, in 1995this is R-13another such report was made. And [G.G.N.] was seen by the S.C.R.B., and it was the decision of the S.C.R.B. to forward his case to the State Parole Board, recommending after-care as developed by the A.D.T.C. treatment staff. He was seen by the parole board in December of '94. And the decision of the board was deferred for further information. He was re-listed and was denied parole and deferred back to the S.C.R.B.
And then this was prepared, this document, R-13, in May of 1995. His case was discussed with Panel-A of the treatment staff. This is the conclusion. And it was recommended to refer his case back to the S.C.R.B. for reconsideration. His parole and after-care plans were outlined above. Further inpatient treatment is no longer recommended.
I reviewed carefully only the more recent therapy reports generated from A.D.T.C. I have reviewed cursorily the older therapy reports. But I do observe in the reports, R-19, R-20, R-21, R-22 and R-23, that the closer the respondent came to his max-out date, the lower the scoring got. It never got bad, but in October of 1999 there were scores of 6, which is just next to 7, high or excellent, and 5 on overall progress toward goal.
The last one for October of 2001 are scores of 5 and 3. Again, 5 being the score for overall progress toward treatment goals. And the comment on the last one: Continue to address anxiety and possibly self-defeating behavior relating to prolonged incarceration. And here, the conclusion: [G.N.N.] has the issue of leaving the facility after long-care incarceration and emphasis will have to be placed on avoiding self-defeating behaviors.
[G.N.N.] has acknowledged his anxiety about leaving which can only be alleviated through specific and well-deliberated release plans. The final line is: Further in-patient treatment is recommended until he reaches his max date.
We have previously approved the use of hearsay in SVP hearings, but not on an unlimited basis. In J.H.M., supra, we said:
Evidentiary decisions of a trial judge are reviewed utilizing the abuse of discretion standard. Pressler, Current N.J. Court Rules, comment 2.4 on R. 2:10-1 (Gann 2003) (citing State v. Brown, 170 N.J. 138, 147, 784 A.2d 1244[, 1250] (2001)). While out-of-court statements used to prove the truth of the matter asserted are inadmissible hearsay, see N.J.R.E. 802, an expert *578 who substantially relies on hearsay evidence for his or her opinion may testify at trial as long as the hearsay information "was of a type `reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" N.J.R.E. 703; see, Biunno, Current N.J. Rules of Evidence, comment 6 on N.J.R.E. 703 (Gann 2002) (citing Corcoran v. Sears Roebuck and Co., 312 N.J.Super. 117, 134-36, 711 A.2d 371[, 379-381] (App.Div.1998)).

N.J.R.E. 703 specifically provides that facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject ... need not be admissible in evidence." "Hearsay statements upon which an expert relies are ordinarily admissible provided that they are of a type reasonably relied upon by experts in the field." State v. Vandeweaghe, 351 N.J.Super. 467, 480, 799 A.2d 1[, 8-9] (App.Div.2002). "However, hearsay is not admissible substantively as establishing the truth of the statement." Ibid. A psychiatrist is permitted to testify about a defendant's prior criminal history in order to offer an opinion about a defendant's mental condition. State v. Eatman, 340 N.J.Super. 295, 302, 774 A.2d 571[, 575-576] (App.Div.2001).
Here, the introduction of the presentence reports was proper since such evidence was of a type reasonably relied upon by mental experts in formulating their evaluations of an individual's mental condition. "An expert is permitted to rely on hearsay information in forming his opinion concerning the defendant's mental state." Eatman, 340 N.J.Super. at 302, 774 A.2d at 575. Unfortunately, W.Z., the seminal case in New Jersey dealing with civil commitment under the SVPA, does not offer any direct guidance with respect to this specific evidentiary issue. Nonetheless, W.Z. does stress the importance of an expert's evaluation of a defendant's mental condition for purposes of civil commitment under the SVPA such that a mental expert should be permitted to rely on hearsay information. See W.Z., 173 N.J. at 127, 801 A.2d 205 [at 215-216] (stating that SVPA requires evidence of past sexually violent behavior and a present mental condition to determine if the individual needs to be incapacitated in order to prevent the individual from reoffending.)
[J.H.M., supra, 367 N.J.Super. at 612-613, 845 A.2d at 146-147.]
More recently we again approved the use of hearsay as the basis for expert testimony and the hearing judge's evaluation of expert credibility. In re Commitment of A.X.D., 370 N.J.Super. 198, 201-202, 851 A.2d 37, 39-40 (App.Div.2004); accord In re Commitment of E.S.T., 371 N.J.Super. 562, 576, 854 A.2d 936, 945 (App.Div.2004) (noting that "the trial judge must take pains to consider such hearsay material not as substantive evidence but only as a basis for the expert's opinion"). We also there noted that some hearsay is admissible for the truth of the matter stated such as business records admissible under N.J.R.E. 803(c)(6); A.X.D. supra, 370 N.J.Super. at 202, 851 A.2d at 40. Consideration, however, of "complex diagnoses" contained in reports would be improper. Ibid.; accord E.S.T., supra, 371 N.J.Super. at 576, 854 A.2d at 945. What is more complex than the evaluation of a mental state?
A further word of caution is appropriate. Evidence being proffered as an admissible business record under N.J.R.E. 803(c)(6) must be carefully scrutinized for inadmissible included hearsay and other *579 potentially unreliable information. Liptak v. Rite Aid, Inc., 289 N.J.Super. 199, 221-222, 673 A.2d 309, 320-321 (App.Div.1996) (finding that opinion of a therapist at a mental health clinic should not have been admitted as a business record). Moreover, N.J.R.E. 803(c)(6) is expressly made subject to N.J.R.E. 808, which provides:
Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.
This evidence rule codifies the law as established by State v. Matulewicz, 101 N.J. 27, 499 A.2d 1363 (1985); see Nowacki v. Community Med. Ctr., 279 N.J.Super. 276, 284, 652 A.2d 758, 762 (App.Div.), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995) (holding that it was within the trial court's discretion to redact doctors' opinions from hospital records especially where issue involved complex diagnosis). We also note that the hearsay exception for statements made for purposes of medical diagnosis or treatment, N.J.R.E. 803(c)(4), is directed at statements made by the patient not the doctor or therapist. R.S. v. Knighton, 125 N.J. 79, 87, 592 A.2d 1157, 1161 (1991).
Here, there was no N.J.R.E. 104(a) hearing as such. G.G.N.'s counsel raised a general hearsay objection to three of eleven documents the State marked for identification. The hearing judge summarily concluded they were business records, but acknowledged that there might be some included hearsay problems. That concern was not pursued by court or counsel. Ultimately, the State moved eleven documents into evidence and G.G.N. moved at least as many, the record is not clear.
G.G.N. urges us to adopt the principles recently espoused by the United States Supreme Court in Crawford v. Washington, ___ U.S. ___, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). There, the Court held that in a criminal trial hearsay testimony is barred under the Confrontation Clause of the United States Constitution unless witnesses are unavailable and defendant has had a prior opportunity to cross-examine those witnesses. ___ U.S. at ___, 124 S.Ct. at 1374. This regardless of any finding of reliability. Ibid. We have found no case in any jurisdiction that has extended Crawford to a civil commitment proceeding where the burden of proof is less than beyond a reasonable doubt. The Supreme Judicial Court of Massachusetts has specifically declined to do so. Commonwealth v. Given, 441 Mass. 741, 808 N.E.2d 788, 794 n. 9 (2004) (refusing to apply Crawford to civil commitment case in which the Sixth Amendment confrontation clause does not apply). The court noted that
[u]nlike the confrontation clause, due process demands that evidence be reliable in substance not that its reliability be evaluated in "a particular manner." That the focus on reliability may not accommodate a simple, predictable, bright-line rule does not alter the fact that reliability, not cross-examination, is the "due process touchstone."
[Ibid.]
Even without the explicit restriction adopted in Crawford, there is a tipping point where due process is violated by the use of hearsay. "As we view it, the infirmity lies in the greatly reduced, if not *580 entirely absent, opportunity for effective cross-examination, a right specifically guaranteed by the SVPA...." E.S.T., supra, 371 N.J.Super. at 573, 854 A.2d at 943.
In the present instance, the State presented two witnesses, neither of whom treated G.G.N. over the fourteen years he was in ADTC. The doctors relied on numerous reports from ADTC and a short interview with G.G.N. They came close to testifying that in their view, commission of the original offenses, twenty-one years earlier, was sufficient for SVP commitment. The only bridge to the present day was the ADTC hearsay, most particularly the institutional infractions found indicative of self-sabotage. As the hearing judge noted, those infractions appear inconsequential although she was willing to accept the doctors' conclusions that they were significant. Whether she was accepting that from the doctors' testimony or from the ADTC staff reports moved into evidence is unclear. The details of the infractions were, in large part, unknown to the State's witnesses, only the briefest description being available in the reports admitted into evidence. Nor did the witnesses explain how they reached the conclusions that these infractions were talismanic of future sexual assaults. In our view, opinion evidence should be more firmly rooted in relevant data to justify commitment.
To be committed under the SVPA an individual must be proven to be a threat to the health and safety of others because of the likelihood of his or her engaging in sexually violent acts. Pursuant to our holding today, the State must prove that threat by demonstrating that the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend.
[W.Z., supra, 173 N.J. at 132, 801 A.2d at 218.]
The Supreme Court in W.Z. further emphasized that "[c]ommitment is based on the individual's danger to self and others because of his or her present serious difficulty with control over dangerous sexual behavior." Id. at 132-133, 801 A.2d at 218. As we read W.Z, the commission of the original crimes is not in and of itself conclusive of further commitment. Proof of past sexually violent conduct is a precondition to a finding that a person is a sexually violent predator, but the Act also requires proof of present mental abnormality or personality disorder. Id. at 127, 801 A.2d at 215. The fact that such a conclusion is necessarily predictive should not invite mere guesswork. A person who is susceptible to SVP commitment must be "highly likely" to engage in acts of sexual violence.
Although the "likelihood" requirement is not defined further in the Act, we import into that analysis the "serious difficulty" standard. An individual may be considered to pose a threat to the health and safety of others if he or she were found, by clear and convincing evidence, to have serious difficulty in controlling his or her harmful behavior such that it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend.
[Id. at 130, 801 A.2d at 217 (emphasis added); see N.J.S.A. 30:4-27.26.]
Evidence is clear and convincing when it
produce[s] in the mind of the trier of fact a firm belief or conviction as to the *581 truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact-finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.
[State v. Hodge, 95 N.J. 369, 376, 471 A.2d 389, 393 (1984) (citations omitted); accord Matter of Jobes, 108 N.J. 394, 407-408, 529 A.2d 434, 440-441, reconsideration denied, 108 N.J. 589, 531 A.2d 1360, stay denied sub nom., Lincoln Park Nursing and Convalescent Home v. Kahn, 483 U.S. 1036, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987).]
We are satisfied that on the facts presented, the State's witnesses gave excessive weight to the original crimes in finding present day likelihood to engage in acts of sexual violence. Fourteen years of positive treatment cannot be dismissed upon nine nonsexual infractions of a minor nature. Infractions, we note, that G.N.N.'s primary therapist for nine years, Turek, discounted as minimally relevant to present considerations. Nor can we condone the almost total reliance on hearsay to encapsulate fourteen years of therapy. For instance, Turek pointed out that in order for a patient to get before the SCRB with a favorable recommendation, as G.G.N. often did, he would have to pass "two panels composed of 12 to 16 psychologists who evaluated him and who had come to a consensus that he had done what was necessary to return safely to the community." Yet, the State presented no insight into those evaluations nor into very much else that occurred during the fourteen years of treatment. Turek also said G.G.N.'s capacity to reach out and care about other people was remarkable. "He would consistently go out of his way to try to be there for other people." The State did not call Turek and the State's witnesses apparently never talked to Turek. In our view, the State's proofs were much too facile. They were inadequate to meet the required burden of proof. The extensive reliance on hearsay was fundamentally unfair.
All that being so, G.G.N. cannot simply be released to the public. Two years have passed since the hearing we have reviewed. The State's deficiencies should not prejudice the public interest embodied in the SVPA. Accordingly, we remand for a hearing that comports with this opinion. If the State cannot proffer evidence sufficient to support continued commitment then G.G.N. must be released, subject to those conditions the court determines are appropriate.
Reversed and remanded.
NOTES
[1] One psychiatrist tape recorded an interview with G.G.N. on the first day of trial. Both that interview and his previous unrecorded interview with G.G.N. lasted about half an hour. The psychiatrist testified that G.G.N. said nothing to him during the recorded interview that would have changed his opinion or recommendation. Neither side introduced the tape at trial.
[2] The subject of G.G.N.'s alleged sexual conduct at ADTC is addressed later in this opinion.