**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3493-15T1

MAXINE A. REID,

    Plaintiff-Respondent,

v.

JOHN J. McKEON and
JOYCE A. McKEON,

    Defendants-Appellants.

_____

Argued November 14, 2017- Decided August 21, 2018

Before Judges Leone and Mawla.

On appeal from Superior Court of New Jersey,
Law Division, Middlesex County, Docket No. L-
1845-14.

Damian A. Scialabba argued the cause for
appellants (Sponder & Sellitti, attorneys;
Matthew R. Panas, Douglas J. Nosko, and Lori
A. Kaniper, on the briefs).

Paul R. Garelick argued the cause for
respondent (Lombardi and Lombardi, PA,
attorneys; Paul R. Garelick, on the brief).

PER CURIAM

In this auto accident litigation, a jury awarded plaintiff

Maxine A. Reid $250,000. Defendants John J. and Joyce A. McKeon

appeal from an April 15, 2016 order denying their motions for a new trial and remittitur. We affirm.

I.

At approximately 8:15 a.m. on May 10, 2012, plaintiff was driving her vehicle in Edison when it was struck from behind by a vehicle driven by John McKeon and owned by Joyce McKeon. Plaintiff sued defendants. Prior to trial, defendants stipulated to liability.

At trial, plaintiff testified as follows. Immediately following the accident, she experienced numbness in her lower body and was unable to lift her legs. She was taken by ambulance to the emergency room, and spent most of the day there. When she left, she felt numbness in her legs, neck, and back. That afternoon, she made an appointment to see an orthopedic doctor at the Edison Metuchen Orthopedic Group (EMOG). The soonest available appointment was four days later with Dr. Teresa Vega.

Plaintiff testified that on May 14, 2012, she told Dr. Vega that "I had pain in my neck and my lower back was numb and my legs." The pain in her neck was throbbing with numbness that became "stabbing sharp pains." Dr. Vega recommended physical therapy. On July 25, 2012, plaintiff saw Dr. Vega for a follow-up appointment.

2

Plaintiff testified that she had constant leg and neck pain every day in 2013, and that the pain in her neck increased and became unbearable at times. On May 31, 2013, plaintiff saw Dr. Robert Lombardi at EMOG, who was treating her for a pre-existing shoulder condition. On June 28, 2013, plaintiff began to see Dr. Joseph Lombardi at EMOG, who treated her for pain in her neck and shoulder. She completed twelve weeks of physical therapy in 2014.

In addition to her testimony, plaintiff presented the video of the trial deposition of Dr. Joseph Lombardi, who opined the accident caused cervical disc herniation at C4-C5 and C5-C6, and a bilateral C6 radiculopathy, and aggravated a pre-existing lumbar disc herniation at L5-S1 and lumbar radiculopathy. Defendants presented the testimony of expert Dr. David Rubinfeld, who opined the accident caused only cervical and lumbosacral sprains.

The jury found by a preponderance of the objective credible medical evidence that plaintiff sustained a permanent injury as a proximate result of the accident. It awarded her $250,000, which was memorialized in the trial court's January 4, 2016 order of judgment. Defendants filed motions for a new trial, to alter or amend the judgment, and for remittitur. The trial judge denied the motions on April 15, 2016. Defendants appeal.

II.

Most of plaintiff's claims challenge the admission or exclusion of evidence. "'[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). "In light of the broad discretion afforded to trial judges, an appellate court evaluates a trial court's evidentiary determinations with substantial deference," and affords them "'[c]onsiderable latitude.'" State v. Cole, 229 N.J. 430, 449 (2017) (citation omitted). The court's determination will be affirmed "'absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (citations omitted). Thus, an appellate court "will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Ibid. (citation omitted). We must hew to that standard of review.

A.

Cross-examining Dr. Joseph Lombardi during the trial deposition, defense counsel asked him about Dr. Vega's records of her lumbar and cervical examinations of plaintiff. Citing James v. Ruiz, 440 N.J. Super. 45 (App. Div. 2015), plaintiff's counsel

4

objected to the elicitation from Dr. Lombardi of any opinions of Dr. Vega. Later, the trial court, citing James, sustained plaintiff's objection.

In James, we held that an attorney may not "question[] an expert witness at a civil trial, either on direct or cross-examination, about whether that testifying expert's findings are consistent [or inconsistent] with those of a non-testifying expert who issued a report in the course of an injured plaintiff's medical treatment" if "the manifest purpose of those questions is to have the jury consider for their truth the absent expert's hearsay opinions about complex and disputed matters." 440 N.J. Super. at 51.

Defense counsel's cross-examination of Dr. Joseph Lombardi about Dr. Vega's findings had the manifest purpose of showing they were inconsistent with Dr. Lombardi's later findings and to have the jury consider Dr. Vega's findings for their truth. The issue is whether Dr. Vega's findings were "complex and disputed." Ibid.

There was no evidence Dr. Vega's findings were disputed. Dr. Joseph Lombardi acknowledged that Dr. Vega was his colleague at EMOG, that her records were in his file, and that she reached these findings. He did not question their accuracy.

Whether Dr. Vega's findings were complex is a more involved inquiry. That inquiry derives from the business records exception

A-3493-15T1

under N.J.R.E. 803(c)(6) and N.J.R.E. 808.  As Dr. Vega's "findings are contained in a written report, it is useful to the analysis to consider whether the report itself would meet [that] hearsay exception, even though neither party attempted to move the report into evidence."  James, 440 N.J. Super. at 61.  Moreover, defense counsel's brief cited those rules to the trial court.

N.J.R.E. 803 provides that "statements are not excluded by the hearsay rule" if they are:

> Records of regularly conducted activity.  -- A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.
>
> [N.J.R.E. 803(c)(6) (emphasis added).]

Although it is undisputed Dr. Vega's report met the other requirements spelled out in N.J.R.E. 803(c)(6), the admission of her "opinions or diagnoses" is "subject to Rule 808."  Ibid. N.J.R.E. 808 provides:

> Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the

> circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

> [N.J.R.E. 808 (emphasis added).]

N.J.R.E. 808 "codifies the principles set out in" State v. Matulewicz, 101 N.J. 27 (1985). State v. Miller, 170 N.J. 417, 428 n.1 (2002); see James, 440 N.J. Super. at 63. In Matulewicz, our Supreme Court cited with approval our cases recognizing that "'"expert opinion contained in a business record may be excluded if it relates to diagnoses of complex medical conditions. . . ." Conversely, routine observations, findings and complaints included in such a record were termed clearly admissible.'" 101 N.J. at 32 n.1 (citations omitted).

"The formulation of Rule 808 is intended to include in general terms all of the specific criteria discussed in Matulewicz," including "the complexity or routine nature of the procedures used in making the analysis, the degree of objectivity and subjectivity involved, the existence of motive for untrustworthiness, and the responsibility of the declarant to be accurate and reliable." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, 1991 Supreme Court Committee Comment on N.J.R.E. 808 (2018) (emphasis added) (quoting Matulewicz, 101 N.J. at 30).

In following "[t]he Matulewicz holding," the drafters of N.J.R.E. 808 acknowledged that "opinions derived from a 'relatively well-established' test, such as a 'blood-grouping test, an alcoholism test, or the taking of an x-ray,' and other 'relatively simple' diagnostic tests contained in hospital records would be admitted in evidence." Ibid. (citing State v. Martorelli, 136 N.J. Super. 449 (App. Div. 1975) (admitting a blood alcohol result in a hospital record)). "[T]he admissibility of ordinary diagnostic findings customarily based on objective data and not usually presenting more than average difficulty of interpretation is usually conceded." Ibid. (quoting McCormick on Evidence § 313 at 732 (Cleary 2d ed. 1972)). "[T]he distinction" between such "'ordinary diagnostic findings'" and "the diagnosis of complex medical conditions" "has continued under the present rule and is now a settled part of our jurisprudence." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3 on N.J.R.E. 808 (2018).

The following evidence in medical business records has been found to be complex: interpretation of an MRI test, Agha v. Feiner, 198 N.J. 50, 65 n.9 (2009); interpretation of a CT scan, James, 440 N.J. Super. at 72; psychiatric diagnoses, In re Civil Commitment of A.E.F., 377 N.J. Super. 473, 492 (App. Div. 2005); psychological evaluations, N.J. Div. of Child Prot. & Permanency

v. N.T., 445 N.J. Super. 478, 501 (App. Div. 2016); mental state evaluations, In re Commitment of G.G.N., 372 N.J. Super. 42, 56 (App. Div. 2004); a diagnosis of alcoholism, Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 597 (1988); a diagnosis and opinions about infection, McLean v. Liberty Health Sys., 430 N.J. Super. 156, 173 (App. Div. 2013); diagnoses that fractures were "pathologic" or "non-traumatic," Nowacki v. Cmty. Med. Ctr., 279 N.J. Super. 276, 284 (App. Div. 1995); and a Social Security disability determination, Villanueva v. Zimmer, 431 N.J. Super. 301, 313-14 n.3 (App. Div. 2013).

On the other hand, courts have found admissible, because they are not complex, breathalyzer test results, State v. Garthe, 145 N.J. 1, 13 (1996), and blood-alcohol analyses, State v. Michaels, 219 N.J. 1, 36-37 (2014). Moreover, courts have stated that N.J.R.E. 808 does not exclude "a straightforward observation of treating physician," Agha, 198 N.J. at 66, or doctors' "factual observations." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 526 (App. Div. 2017). Thus, we have ruled admissible findings that the patient "has tics and was moving too much at time of procedure," Konop v. Rosen, 425 N.J. Super. 391, 404-05 (App. Div. 2012), and that "'there was no spasm present.'" Blanks v. Murphy, 268 N.J. Super. 152, 163-64 (App. Div. 1993).

The trial court excluded Dr. Joseph Lombardi's deposition testimony that on May 14, 2012, Dr. Vega wrote that: plaintiff "was neurologically intact"; "examination of the cervical spine was negative for tenderness"; "negative spasm or trigger points"; "deep tendon reflexes in lower extremities were normal"; and "it was a completely normal examination as far as the objective examination part."  The trial court also excluded Dr. Lombardi's deposition testimony that on July 25, 2012, Dr. Vega wrote that: plaintiff's "cervical strength is noted as five out of five"; "cervical reflex is normal"; "an examination of the lumber spine shows strength five out of five"; "deep tendon reflexes were normal"; and "straight leg raise was negative."

Dr. Vega's observation that there were no spasms was "a straightforward observation of a treating physician." Blanks, 268 N.J. Super. at 164. With the possible exception of "neurologically intact," Dr. Vega's other notations involved her "factual observations" after reflex testing, strength testing, tenderness testing, and leg raises.  N.B., 452 N.J. Super. at 526.  Those would appear to be "'relatively simple' diagnostic tests," Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, 1991 Supreme Court Committee Comment on N.J.R.E. 808 (2018) (citation omitted), which result in "a straightforward, simple diagnosis based upon objective criteria or one upon which reasonable professionals

could not differ," <u>N.J. Div. of Youth & Family Servs. v. M.G.</u>, 427 N.J. Super. 154, 174 (App. Div. 2012). Such routine "diagnostic findings premised upon objective data requiring an average level of difficulty of interpretation are admissible." <u>Matulewicz</u>, 101 N.J. at 30. "To require those who perform tests which are relatively simple to appear in court and testify would work a hardship on an already overburdened medical system." <u>Martorelli</u>, 136 N.J. Super. at 454.

In excluding Dr. Vega's notations, the trial court stated that they represented "Dr. Vega's opinion about that based on her examination," and that "getting in findings and opinions of other doctors through the testimony of another doctor" was "now completely precluded by <u>James</u>." When defense counsel promptly submitted a brief seeking reconsideration, citing N.J.R.E. 803(c)(6), N.J.R.E. 808, and the cases permitting the admission of routine findings, the trial court reconsidered but declined to change its ruling:

> I don't think it's routine matters. When they're talking about using the kinds of information that [is] routine as opposed to opinions and conclusions, they're not talking about test results. Those are subject to interpretation based on the medical knowledge, training, [and] skill of the examiner.

Unfortunately, the trial court read <u>James</u> too broadly. <u>James</u> did not hold that a doctor could never testify about the opinions

or findings of another doctor. Nor did we hold that a doctor could not testify about another doctor's test results from a simple physical exam. Rather, in James, we repeatedly made clear that our holding was limited to testimony about "complex and disputed matters," "complex and disputed opinions," and "complex and disputed findings." Id. at 51, 66; see id. at 56-57, 62-64, 67-69, 72-73 and n.16. We reaffirmed that "case law in our State has traditionally admitted 'routine' findings of experts contained in medical records that satisfy the business record exception, but has excluded 'diagnoses of complex medical conditions' within those records." Id. at 63 (citing Matulewicz, 101 N.J. at 32 n.1).

Accordingly, most or all of Dr. Vega's findings were admissible hearsay if properly presented. Defense counsel tried to present them by showing that Dr. Joseph Lombardi reviewed Dr. Vega's records before treating plaintiff on June 28, 2013, and in preparing his September 14, 2014 narrative report. However, Dr. Lombardi's narrative report made no reference to review of prior records or x-rays, and he testified "[i]f I didn't put it in [my report], I probably did not" see any records. Regarding June 28, he took "a history from the patient," and "reviewed the history of what she told me about her prior records."

Defense counsel asked Dr. Joseph Lombardi about June 28:

> Q. Okay. At that point, did you have an opportunity to read those records when she first started treating with [EMOG]?
>
> A. I would have had those records, yes.

However, the trial court found "[t]hat doesn't mean he read them," just that "they're in the file." The court stressed "he didn't say he used them in any way or relied upon them in any way." We cannot say the court erred in finding Dr. Lombardi did not review Dr. Vega's records before treating her, or rely on them in preparing his report.

Because Dr. Lombardi did not base his opinion on Dr. Vega's notations, N.J.R.E. 703 did not apply. "[H]earsay statements relied upon by an expert may be used for the limited purpose of apprising the jury of the basis of the testifying expert's opinion," but the "expert may not 'alert[ ] the jury to evidence it would not otherwise be allowed to hear.'" Hayes v. Delamotte, 231 N.J. 373, 392-93 (2018) (citation omitted).

In any event, defendants ultimately were able to have Dr. Vega's most favorable notations admitted into evidence another way. The trial court allowed defense counsel to elicit from Dr. Rubinfeld, the defense expert, that he reviewed Dr. Vega's records from May 14, 2012. Dr. Rubinfeld described the routine examinations performed by Dr. Vega. He testified that Dr. Vega's "lumbar examination was totally normal," and her cervical

examination "was negative for focal tenderness," spasms, and trigger points, and showed "[a] very normal . . . neck." To avoid being "accused of overlooking anything," Dr. Rubinfeld added that plaintiff "did have pain in the left paraspinal musculature." Thus, the trial court admitted evidence that Dr. Vega's examination of plaintiff's neck and back showed they were normal four days after the accident, with one complaint of pain.

Defense counsel did not attempt to ask Dr. Rubinfeld similar questions about Dr. Vega's July 25 notations, which were less favorable for defendants. Dr. Vega's cervical spine examination showed "[p]ositive tenderness on left paraspinal musculature," and "[d]iscomfort with all motion." Dr. Vega's lumbar spine examination showed "[m]ild tenderness to palpitation in midline and [perilumbar] region," "[p]ain in the lumbosacral area," and "[r]ange of motion with difficulty." That evidence of pain and other negative symptoms would likely have been brought to the jury's attention had defense counsel attempted to elicit Dr. Vega's positive notations about plaintiff's normal cervical and lumber strength and reflexes, and her negative straight leg raise. Defense counsel did not try to elicit those notations by questioning Dr. Rubinfeld or offering Dr. Vega's July 25 report as a business record.

Even assuming defense counsel could elicit through Dr. Joseph Lombardi the notations in Dr. Vega's records which he testified he never reviewed, any error was harmless. Defendants were able to place in evidence the most favorable and telling notations that four days after the accident Dr. Vega's lumbar examination had totally normal results and her cervical examination showed a very normal neck with a complaint of pain. Dr. Vega's examination four months later included more evidence of pain that would have outweighed the positive strength and reflex findings. Thus, any error was not "clearly capable of producing an unjust result." R. 2:10-2.

B.

Defendants next assert the trial court erred under James in allowing plaintiff's counsel to cross-examine defendants' expert about the emergency room records from the day of accident. The cross-examination arose from the direct-examination, when defense counsel showed Dr. Rubinfeld the records and asked: "And in the emergency room, did Ms. Reid have any complaints of neck pain?" Dr. Rubinfeld responded: "No. Not that I see, no."

On cross-examination, plaintiff's counsel referenced the testimony on direct, showed Dr. Rubinfeld the records, and pointed

to "Diagnosis 2."[1]  After defense counsel objected, the trial court ruled plaintiff's counsel could ask if "anything in there . . . indicates that she complained about pain" in the neck.  Plaintiff's counsel then asked Dr. Rubinfeld: "Does looking at that record refresh your recollection that my client complained of neck pain?" He answered, "if you look at the diagnosis, sure." Plaintiff's counsel directed the doctor to the word "neck," and asked if "there's a plus in there?" and if the plus meant "that was found; right?"[2]  Dr. Rubinfeld answered both questions affirmatively. Plaintiff's counsel asked if that refreshed the doctor's recollection "about paravertebral tenderness complaints by my client?"  Dr. Rubinfeld replied that "I would say she had tenderness."  Plaintiff's counsel directed the doctor to "the Emergency Medical Decision Making" section where it said "cervical spine."[3]  Defense counsel objected, and the court asked: "Can you tell from those records that she complained about neck pain or not?"  Dr. Rubinfeld answered: "Yeah, I think so."

---

[1] The Diagnosis section included a diagnosis "Neck Strain."

[2] The Physical Examination section included: "Neck: (+) Mild paravertebral tenderness."

[3] The Emergency Medical Decision Making section included: "Cervical spine injury."

A–3493–15T1

Nothing in James prohibited plaintiff's counsel from asking if the emergency room records indicated plaintiff complained of neck pain. Rather, James stated that where the purpose of cross-examination "was to show that the defense expert's review of the patient's records was skewed or incomplete, such a line of inquiry arguably would amount to simply impeachment of the defense expert's credibility, an attack that does not hinge upon the actual truth of the absent declarant's statements." 440 N.J. Super. at 75.

Although plaintiff's counsel had Dr. Rubinfeld look at portions of the records containing diagnoses, the diagnoses were not revealed to the jury, and plaintiff's counsel told Dr. Rubinfeld "I don't want to talk to you about the opinions they made." By contrast, the cross-examination in James "was plainly designed to get before the jury the substance of [the radiologist's] findings," and "improperly sought to elicit the contents of [his] opinions for their truth." Id. at 77-78; see id. at 56-57, 75.

The questions about the "plus" and about "paravertebral tenderness" simply related findings made after a physical examination. Defendants agree plaintiff's attorney could ask Dr. Rubinfeld about those routine findings. Thus, unlike in James, plaintiff's counsel did not elicit "the non-testifying expert's complex and disputed opinions." Id. at 51.

17

Defendants mainly complain they were not allowed to ask Dr. Joseph Lombardi about similar routine findings from Dr. Vega's physical examinations. However, Dr. Lombardi had not reviewed Dr. Vega's records. By contrast, Dr. Rubinfeld had reviewed the emergency room records and Dr. Vega's May 14, 2012 records, and the trial court allowed the routine findings from those records to be elicited through Dr. Rubinfeld by plaintiff and defendants respectively. As any error in not allowing defendants to elicit Dr. Vega's findings through Dr. Lombardi was harmless, defendants' complaint lacks substance.

## C.

Defendants also argue the trial court erred by not allowing Dr. Rubinfeld to testify about a report by a different EMOG doctor, Dr. Robert Lombardi. On cross-examination, plaintiff testified she went to see Dr. Robert Lombardi and complained about an unrelated shoulder condition on May 31, 2013. She said she also had neck and back pain but did not mention it because "I didn't go there for that on that day" and "I wasn't seeing Dr. Robert for that."

Later, defense counsel asked Dr. Rubinfeld if plaintiff had "any neck or back pain that's reflected in that report" by Dr. Robert Lombardi on May 31, 2013. Plaintiff objected. The trial court stated if Dr. Robert Lombardi were testifying and defense

18

counsel asked "did [plaintiff] complain about something and he said no, that would be ok."  Because he was not a witness, the court said it did not "have any way to know whether or not Dr. Robert Lombardi would have said he didn't write down stuff that was unrelated to my thing or [he] did or it was incomplete."

We note Dr. Robert Lombardi's May 31, 2013 report discussed plaintiff's "Chief Complaint," "History of Present Illness," and "Shoulder Examination," all addressing solely her shoulders.  The only broader portion of the report stated:

> General Exam:
> Constitutional: Patient is adequately groomed with no evidence of malnutrition.
> Skin:  There are no rashes, ulcerations or lesions in the regions examined.
> Mental Status:  The patient is oriented to time, place and person.  The patient's mood and affect are appropriate.

Thus, the report did not indicate that Dr. Lombardi asked plaintiff if she had pain in areas other than her shoulders.

Defendants cite plaintiff's testimony that during 2013 she had severe pain from the accident, and that in 2015 Dr. Robert Lombardi treated her for pain in her shoulders resulting from her neck pain.  However, defendants failed to show plaintiff told Dr. Lombardi she did not have pain in her back or neck on May 31, 2013.  Absent a "statement," N.J.R.E. 803(b)(1) and N.J.R.E. 803(c)(4) are inapplicable.  See N.J.R.E. 801(a).

To the extent defendants were seeking to establish that Dr. Robert Lombardi did not ask plaintiff, and plaintiff did not volunteer, whether she had pain in her neck and back, defendants offered no evidence "to establish that it would be natural for the witness to have made the omitted statement" to a doctor then treating her for a different, pre-existing condition. Manata v. Pereira, 436 N.J. Super. 330, 345 (App. Div. 2014). Defendants did not cite N.J.R.E. 803(c)(7) or attempt to meet its prerequisites.

In any event, in denying defendants' motion for a new trial, the trial court found "the fact that Dr. [Robert] Lombardi's report 'was silent' on whether Reid was or was not experiencing pain in her back or neck, and the reason for the 'silence' is, at best, completely speculative and lacking probative value, and is, in any event, precluded by Rule 403." As the trial court noted, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403.

"A trial judge retains the authority under . . . N.J.R.E. 403 . . . to guard against unfair use of" silence. Manata, 436 N.J. Super. at 344-45. "'[D]eterminations pursuant to N.J.R.E. 403 should not be overturned on appeal "unless it can be shown that the trial court palpably abused its discretion, that is, that its

finding was so wide off the mark that a manifest denial of justice resulted."'" Brenman v. Demello, 191 N.J. 18, 31 (2007) (citation omitted). It was not a palpable abuse of discretion for the trial court to exclude defendants' attempt to elicit and rely on plaintiff's alleged silence, which the court could find was confusing, misleading, and prejudicial.

D.

Defendants' final evidentiary challenge concerns plaintiff's mentions of insurance to explain her delays in following her EMOG doctors' recommendations. On direct examination, plaintiff testified without objection:

> it took me quite a while to get into physical therapy because I was constantly calling [Allstate] and they were telling me they're not responsib[le]. . . . I only went three weeks because that was the only time [Allstate] approved of payment for that. I had to wait until I had the insurance to get into other physical therapy.

On cross-examination, defense counsel asked why plaintiff made no mention of her neck and back pain when she went back to EMOG on May 31, 2013, "after a ten-month period." After responding she "wasn't seeing Dr. Robert for that," she added: "And the 10-month period was due to insurance not being able to pay for that." Defense counsel moved to strike, saying "[i]t's not responsive." The court said "I'm not sure that's not responsive, but just ask

21

your next question." Defense counsel asked questions eliciting that Dr. Joseph Lombardi later recommended physical therapy, and then asked:

> Q. And he wanted you to follow up with him in four weeks?
>
> A. Yes.
>
> Q. Right? And then you don't go for 12 weeks?
>
> A. No.
>
> Q. Correct?
>
> A. Because I needed to have someone pay for it and nobody — [Allstate] wasn't paying for it. I have to wait for my insurance to approve it.

Defense counsel objected, but the trial court stated "you opened the door." In fact, plaintiff's interjections about insurance were unresponsive to defense counsel's questions about why she had not complained about neck and back pain on May 31, 2013, and whether she did not go back to EMOG for twelve weeks. Nonetheless, the court ruled "she's entitled to tell the reason she didn't go was because she couldn't pay."

Defendants cite N.J.R.E. 411, which states that "[e]vidence that a person was or was not insured against liability is not admissible on the issue of that person's negligence or other wrongful conduct." Ibid. (emphasis added). However, N.J.R.E. 411 addresses the risk "that if jurors know that an insurance company

22

will be paying a judgment, [then the jurors] might be reckless in awarding damages to a plaintiff." Bardis v. First Trenton Ins. Co., 199 N.J. 265, 275 (2009) (quoting Biunno, Current N.J. Rules of Evidence, cmt. on N.J.R.E. 411 (2008)).

That risk was not posed here. It is undisputed that Allstate was plaintiff's automobile insurer, not defendants' insurer. The revelation that plaintiff had insurance was not offered or used to show that defendants were negligent or engaged in culpable conduct, "'or made the basis at the trial for an appeal to increase or decrease the damages.'" Krohn v. N.J. Full Ins. Underwriters Ass'n, 316 N.J. Super. 477, 482 (App. Div. 1998) (citation omitted). Defendants have not shown they were prejudiced.

Moreover, "[t]he exclusionary aspect of N.J.R.E. 411 is limited." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. on N.J.R.E. 411 (2018). N.J.R.E. 411 provides that, "[s]ubject to Rule 403, this rule does not require the exclusion of evidence of insurance against liability when offered for another purpose[.]" Plaintiff's reference to her own insurer's alleged failure to promptly pay her medical bills served another purpose, namely to explain her delay in seeking further treatment. Defense counsel did not object under N.J.R.E. 403, nor did she object to similar comments on direct. In any event, "[t]he mere mention of [insurance] coverage has been held not to be prejudicial

23

error." <u>Krohn</u>, 316 N.J. Super. at 482. Moreover, defendants never requested a limiting instruction.

Defendants contend plaintiff's testimony was untrue because Allstate paid her medical bills promptly, and told her so in Explanation of Benefits forms (EOBs). However, that does not impugn the trial court's ruling on the objections. Defendants could have introduced proof to rebut plaintiff's claim. Indeed, after the objections were denied, defense counsel asked plaintiff "isn't it true that . . . [a]ll your medical bills were paid and there was no issue . . . with any payment?" Plaintiff admitted "[m]y medical bills were paid by . . . my primary insurance." Defense counsel suggested the EOBs would show the bills were paid in a timely fashion, and the court stated it would "certainly allow" defense counsel to introduce those records. Defense counsel stated she would look for the records, but she never tried to question plaintiff with the records or offer them into evidence. Having failed to do so at trial, defendants cannot do so on appeal.

### III.

Defendants make two challenges to plaintiff's closing argument for plaintiff. "'[C]ounsel is allowed broad latitude in summation.' That latitude is not without its limits, and 'counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced during the course

of the trial.' Further, counsel 'should not misstate the evidence nor distort the factual picture.'" Hayes, 231 N.J. at 387 (citations omitted). "Within those limits, however, '[c]ounsel may argue from the evidence any conclusion which a jury is free to reach.' 'Indeed, counsel may draw conclusions even if the inferences that the jury is asked to make are improbable.'" Id. at 388 (citations omitted).

Defendants contend plaintiff's counsel mentioned insurance in his closing argument. After noting plaintiff got an MRI examination within four months of the accident, plaintiff's counsel argued:

> Now, you know, I think the reasonable person knows how long it takes to get into a doctor, see a doctor, get examined, get approvals, go to and get MRIs done. That just doesn't happen in a day. There's a process that people go through in their medical treatment.

Defendants did not object to this argument, which made no explicit reference to insurance, and no conceivable reference to their insurance. Defendants cannot show plain error. R. 2:10-2.

Defendants also argue plaintiff's counsel misused the time-unit rule. "In civil cases any party may suggest to the trier of fact, with respect to any element of damages, that unliquidated damages be calculated on a time-unit basis without reference to a specific sum." R. 1:7-1(b). "Under the rule, 'counsel may suggest

to the trier of fact that it calculate damages on the basis of specific time periods, for example, the amount of pain that a plaintiff will suffer each day for the rest of his life.'" Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 123 n.4 (2004) (quoting Friedman v. C & S Car Serv., 108 N.J. 72, 74 (1987)). "Nevertheless, while reference to time units is permissible, mention of specific dollar amounts remains prohibited." Ibid. (citing Weiss v. Goldfarb, 154 N.J. 468, 481 (1998) ("reference to a specific sum may not be made")).

Plaintiff's counsel in closing argued:

> [Y]ou get to pain and suffering. And how do you calculate that? Now, I'll tell you, before I show you this calculation under Rule 1:7-1 for time unit, that, you know, there is no perfect science. It's left to your sound discretion. . . . So there's a calculation that you can do that's under the rules and it's in argument, and I — you know, I follow the rules, I don't . . . make them up. I follow them. . . . It's a time unit analysis under Rule 1:7-1. Now, what you do is, you correlate an amount of money to an aspect of an injury and multiply it by a unit of time. You don't talk dollars. The Judge will tell you, units. Okay? Units are the argument that we make. So you will have units.

After the closing, defense counsel's only objection was "I heard you say money equals units." Plaintiff's counsel said he had not done so, and defense counsel said "Okay."

Nonetheless, on appeal, defendants complain about various words and phrases in counsel's argument, as well as his subsequent calculation of how many units of time plaintiff had lived and would live since the accident. We agree "I follow the rules" was gratuitous. However, that was not prejudicial, and defendants' other complaints are meritless.

Moreover, plaintiff's counsel never mentioned a specific dollar amount. Further, the trial court properly instructed that plaintiff's time-unit argument was "argument only and it does not constitute evidence," and that the jury was "not bound to follow" it or "any particular method in establishing damages." See R. 1:7-1(b). Defendants have not shown plain error.

IV.

Defendants argue the $250,000 awarded by the jury was excessive. "When a court is persuaded that a new trial must be granted based solely on the excessiveness of the jury's damages award, it has the power to enter a remittitur reducing the award to the highest amount that could be sustained by the evidence." Cuevas v. Wentworth Grp., 226 N.J. 480, 499 (2016).

Courts "must exercise the power of remittitur with great restraint." Ibid. "A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness,'" which "is not overcome unless a defendant can establish, 'clearly and

convincingly,' that the award is 'a miscarriage of justice.'" Id. at 501 (citation omitted). "[E]ven a seemingly high award should not be disturbed; only if the award is one no rational jury could have returned, one so grossly excessive, so wide of the mark and pervaded by a sense of wrongness that it shocks the judicial conscience, should a court grant a remittitur." Id. at 500.

The trial "court must view 'the evidence in the light most favorable to the plaintiff,'" and "give 'due regard to the opportunity of the jury to pass upon the credibility of the witnesses.'" Id. at 501 (citations omitted). "The standard for reviewing a damages award that is claimed to be excessive is the same for trial and appellate courts, with one exception — an appellate court must pay some deference to a trial judge's 'feel of the case.'" Ibid. (citations omitted).

In denying defendants' motion for a new trial or remittitur, the trial court found:

> the jury could reasonably have concluded that Reid sustained two herniated discs, which required physical therapy; that the injuries and their consequences, both past, present and future, are so severe that an anterior cervical fusion[,] that would require plates and screws, was recommended; and finally, that Reid has been living with extreme pain for years, and will continue to do so for the rest of her life. Under that version of the facts, the verdict was neither disproportionately excessive nor does it shock the conscience [.]

Defendants have not shown any basis for rejecting this determination by the trial judge who saw and heard the evidence and the jury.

Finally, defendants argue cumulative errors warrant a new trial. "An appellate court may reverse a trial court's judgment if 'the cumulative effect of small errors [is] so great as to work prejudice[.]'" Torres v. Pabon, 225 N.J. 167, 190 (2016) (quoting Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 53 (2009)). However, any error regarding the exclusion of Dr. Vega's double-edged July 25, 2012 notations, and plaintiff's mentioning of her own insurance, were not prejudicial individually or cumulatively and did not "deprive defendants of a fair trial." Pellicer, 200 N.J. at 57.

Defendants' remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We "decline to consider arguments raised for the first time in [defendants'] reply brief." Bacon v. N.J. State Dep't of Educ., 443 N.J. Super. 24, 38 (App. Div. 2015).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3493-15T1