898 A.2d 1027 (2006)
386 N.J. Super. 16
In the Matter of the CIVIL COMMITMENT OF A.H.B. a/k/a A.L.B.
Superior Court of New Jersey, Appellate Division.
Submitted April 4, 2006.
Decided May 26, 2006.
*1028 Yvonne Smith Segars, Public Defender, attorney for appellant A.H.B. (Jean M. Hartmann, Designated Counsel, of counsel and on the brief).
Zulima V. Farber, Attorney General, attorney for respondent State of New Jersey (Patrick DeAlmeida, Assistant Attorney General, of counsel; Lisa Marie Albano, Deputy Attorney General, on the brief).
Before Judges KESTIN, LEFELT and R.B. COLEMAN.
The opinion of the court was delivered by
LEFELT, J.A.D.
Judge Serena Perretti found A.H.B., a twice convicted sex offender, to be a predator under the Sexually Violent Predator Act, N.J.S.A. 30:4-27.24 to -27.38 (the SVPA), and ordered that he be civilly committed to the Special Treatment Unit (STU). A.H.B. appeals, arguing: (a) he was constitutionally entitled to a jury trial; (b) the standard of proof for commitment *1029 must be beyond a reasonable doubt; (c) the State failed to present a psychiatrist from his treatment team who had examined him within five days of his final commitment hearing, as required by the SVPA; (d) the State failed to establish by clear and convincing evidence that, at the time of his final hearing, he required commitment; and (e) Judge Perretti erroneously relied upon hearsay testimony in ordering the commitment. We conclude that A.H.B.'s arguments (a), (b), and (e) are without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). See In re Civil Commitment of E.S.T., 371 N.J.Super. 562, 576, 854 A.2d 936 (App.Div.2004) (permitting hearsay material as a basis for an expert's opinion); In re Civil Commitment of G.G.N., 372 N.J.Super. 42, 46, 855 A.2d 569 (App.Div.2004) (holding that clear and convincing standard applies); In re Civil Commitment of J.S.W., 371 N.J.Super. 217, 225, 852 A.2d 1107 (App.Div. 2004), certif. denied, 183 N.J. 586, 874 A.2d 1105 (2005) (recognizing admissibility of hearsay typically relied on by experts and noting that a trial judge may use hearsay as background in evaluating expert testimony); and In re Civil Commitment of J.H.M., 367 N.J.Super. 599, 606-07, 845 A.2d 139 (App.Div.2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004) (finding no right to jury trial in civil commitment cases). Though we also reject A.H.B.'s arguments (c) and (d), regarding the timeliness and quality of the State's proofs, some explanation is required.
The facts relevant to the issues we discuss are as follows. After sexually abusing his step-daughter, when she was between the ages of eight and twelve, A.H.B. pled guilty to third-degree criminal sexual contact, N.J.S.A. 2C:14-3b. Pursuant to a plea agreement, he was sentenced to two years probation, some weekend jail time, registration and submission of a DNA sample pursuant to Megan's Law, sex specific counseling, and payment of fines.
While on probation for the sexual contact conviction, A.H.B. delayed contacting the treatment center to initiate treatment and did not attend his initial appointment. A.H.B. also missed some group therapy sessions, claiming he did not have transportation.
While A.H.B. was in treatment and still on probation, he re-offended with another young girl, this time a fifteen-year-old. A.H.B. admitted touching her breasts and vagina, digitally penetrating her, and performing oral sex on her.
Eventually, upon A.H.B.'s guilty plea to third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4a, Judge Almeida imposed a sentence of four years imprisonment at the Adult Diagnostic and Treatment Center (Avenel), to run concurrent with an eighteen-month sentence for violating parole. The judge further ordered A.H.B. to submit a DNA sample; to register as a sex offender, subject to community supervision for life; and not to have contact with the victim or any female child or juvenile. A.H.B. was scheduled to complete his sentence on November 15, 2003.
On June 9, 2003, Heather Burnett, L.S.W., and Hilton Miller, Psy.D., prepared a termination report detailing A.H.B.'s treatment at Avenel. The report noted A.H.B.'s understanding of sex offender treatment was "superficial." According to the report, A.H.B. had "very limited understanding of his deviant arousal, [did] not understand the link between the deviant fantasy and the offensive cycle, [had] limited insight into the role of planning and grooming, and limited insight into internal and external high risk situations." According to the MnSOST-R test score of five, A.H.B. was a "moderate" risk to re-offend, *1030 and his Static-99 score of six suggested he was a "high" risk to re-offend.[1]
On August 5, 2003, about three months before A.H.B. was to be released from Avenel, Dr. Roger Harris, a psychiatrist, completed a termination report, concluding that A.H.B. "meets the criteria for involuntary civil commitment." The doctor noted that A.H.B. "has significant cognitive impairment, does not deal well with stress and overall demonstrates very poor judgment." Dr. Harris concluded that A.H.B. had only made "limited treatment gains" and, as he had previously re-offended while on parole, required "an additional level of supervision to insure that he is safe in the community."
Less than one month before A.H.B.'s scheduled release date, Dr. Howard Gilman examined A.H.B. on October 27, 2003, and Dr. Harris re-examined A.H.B. on October 28, 2003, to determine whether A.H.B. should be committed under the SVPA. Both psychiatrists recommended involuntary civil commitment pursuant to the Act.
After being temporarily committed by Judge Paley, A.H.B. appeared before Judge Perretti for a commitment hearing on March 25, 2004.[2] At the hearing, the State presented testimony from two psychiatrists, Luis Zeiguer, M.D., and Roger Harris, M.D., and the defense presented testimony from two psychologists, Robert Carlson, Psy.D, and Jeffery Singer, Ph.D.
Dr. Zeiguer testified that he attempted to meet with A.H.B. on two occasions, November 24, 2003, and January 28, 2004,[3] but on both dates A.H.B. declined interview, explaining that his attorney had advised him not to talk to Dr. Zeiguer. Therefore, at the commitment hearing, Dr. Zeiguer's testimony was based on an evaluation of the pertinent documents, including A.H.B.'s criminal record, reports of other clinicians, including Dr. Harris's reports, the other termination report, and a letter written by one of the victims. The doctor concluded that A.H.B.'s behavior was consistent with a diagnosis of pedophilia, female non-exclusive, involving pre-pubescent children, paraphilia hebephilia non-exclusive, involving post-pubescent children (minors) below the age of consent; and a personality disorder with narcissistic and antisocial traits. He opined that A.H.B. "presents a very substantial, formidable risk to re-offend in the style in which he offended before, unless he's under direct surveillance."
Having last interviewed A.H.B. on October 28, 2003, Dr. Harris also testified for the State. He diagnosed A.H.B. with pedophilia, girls non-exclusive; paraphilia, girls non-exclusive; personality disorder; and some anti-social traits. Dr. Harris found significant that A.H.B. had adult sexual outlets at the time he sexually assaulted underage girls, and that he offended again after having been criminally sanctioned. The doctor did not see any indication that A.H.B. could succeed in outpatient treatment and found that he presented a high risk to re-offend.
Dr. Carlson, a State psychologist employed by the STU, who had last interviewed A.H.B. on March 23, 2004, two days before the final hearing, testified for A.H.B. Dr. Carlson concluded, partially *1031 based upon the March interview, that A.H.B. did not meet the threshold for paraphilia and characterized his risk to re-offend as moderate. He testified that A.H.B.'s "offenses were more characteristic of an ... impulsive hedonistic, opportunistic individual, rather than a specific deviant sexual arousal." The doctor believed that A.H.B. had found "significant benefit for himself" in the treatment program at Avenel, but also expressed concern that A.H.B. may not possess the same ability to control his impulses in the community that he had displayed in the structured setting, and that the Static-9 report score of six was accurate.
A.H.B. also presented testimony from Dr. Jeffrey Singer, a psychologist, who had interviewed A.H.B. on March 2 and March 9, 2004,[4] which was slightly over two weeks before the final hearing. Dr. Singer found that A.H.B. suffered from "a non-identifiable distinct paraphilic pattern of arousal," that he was not anti-social, was of borderline intelligence, and likely suffered from a personality disorder with dependent traits. According to Dr. Singer, the Static-9 should have been scored a four, which indicates "medium-high" risk of re-offending and the MnSOST-R should have been scored a three, indicating low risk. The doctor concluded that A.H.B. presented a low to moderate risk to re-offend and fell "below [the SVPA's] threshold" and that with a higher level of supervision than he had after his initial offense, A.H.B. could be maintained in the community with supervision for life.
On April 20, 2004, Judge Perretti found A.H.B. to be a sexually violent predator and committed him to the STU for one year. The judge rejected the opinions of Drs. Carlson and Singer, and found persuasive Drs. Harris and Zeiguer. She concluded that A.H.B. suffered from "abnormal mental conditions and personality disorders that predispose [him] to sexually violent behavior." Additionally, she found ample evidence supporting Drs. Harris's and Zeiguer's findings that A.H.B. was at a high risk to re-offend.
To be committed to the STU, the State must prove that the alleged predator committed a "sexually violent offense... and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment." N.J.S.A. 30:4-27.26. "[T]he nomenclature of `mental abnormality' or `personality disorder' is not dispositive. What is important is that... the mental condition must affect an individual's ability to control his or her sexually harmful conduct." In re Commitment of W.Z., 173 N.J. 109, 127, 801 A.2d 205 (2002). The alleged predator must be substantially unable to control sexually harmful conduct. Id. at 128, 801 A.2d 205. To meet this standard, "the State must prove that ... the individual has serious difficulty in controlling sexually harmful behavior such that it is highly likely that he or she will not control his or her sexually violent behavior and will reoffend." Id. at 132, 801 A.2d 205. In other words, the State must prove that the alleged predator's "propensity to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others." N.J.S.A. 30:4-27.26.
No one questions that A.H.B. had committed a "sexually violent offense" and there is little dispute over the State's contention *1032 that he suffers from some mental abnormality or personality disorder. Instead, A.H.B.'s most strenuous argument is that the State failed to prove by clear and convincing evidence that, at the time of the hearing, he was substantially unable to control his sexually violent conduct, especially because the State failed to comply in particular with N.J.S.A. 30:4-27.30b, which requires in part that "[a] psychiatrist on the person's treatment team who has conducted a personal examination of the person as close to the court hearing date as possible, but in no event more than five calendar days prior to the court hearing, shall testify at the [commitment] hearing[.]"
The Legislature has utilized substantially similar language in the civil commitment statute for mentally ill persons who are dangerous to themselves, others, or property, N.J.S.A. 30:4-27.13b, requiring the testimony of a "psychiatrist on the patient's treatment team who has conducted a personal examination of the patient as close to the court hearing date as possible, but in no event more than five calendar days prior to the court hearing[.]" We have previously determined that "both statute [N.J.S.A. 30:4-27.13] and court rule [R. 4:74-7(e)] require that a psychiatrist on the patient's treatment team testify at the hearing, and provide medical testimony supporting the need for commitment [of the mentally ill patient]." In re Commitment of Raymond S., 263 N.J.Super. 428, 432, 623 A.2d 249 (App.Div.1993).
In this case involving the SVPA, N.J.S.A. 30:4-30b, the State offered the testimony of two psychiatrists, Drs. Harris and Zeiguer. Dr. Harris came into contact with A.H.B. at Avenel and Dr. Zeiguer at the STU. A.H.B. claims that neither psychiatrist was a member of his treatment team. We reject this claim.
There is a difference between the SVPA's definition of "treatment team" and the definition contained in the civil commitment statute for mentally ill persons. In the involuntary commitment of mentally ill persons' statute, "treatment team" is defined, in part, as "one or more persons, including at least one psychiatrist or physician, and may include a psychologist, social worker, nurse and other appropriate service providers." N.J.S.A. 30:4-27.2dd. The definition further specifies that the "treatment team provides mental health services to a patient of a screening service, short-term care or psychiatric facility." Ibid.
In contrast, the SVPA defines "[t]reatment team" as including "individuals, agencies or firms which provide treatment, supervision or other services at a facility designated for the custody, care and treatment of sexually violent predators." N.J.S.A. 30:4-27.26. Thus, the SVPA more broadly defines the "treatment team" to include not only individuals but also "agencies or firms."
Dr. Zeiguer is employed by the Division of Mental Health Services in the Department of Human Services, which agency provides the treatment "appropriately tailored to address the specific needs of sexually violent predators." N.J.S.A. 30:4-27.34. As a psychiatrist working for the Division at the STU, which houses only "sexually violent predators," In Matter of Civil Commitment of D.L. and C.M., 351 N.J.Super. 77, 80, 797 A.2d 166 (App.Div. 2002), certif. denied, 179 N.J. 373, 845 A.2d 1255 (2004), we consider Dr. Zeiguer, to be a member of A.H.B.'s treatment team, even though the doctor himself may not have provided any treatment services to A.H.B. See N.J.S.A. 30:4-27.26.
Dr. Harris is employed by Correctional Medical Services, which is contracted to provide mental health care to committees at Avenel which houses repetitive *1033 and compulsive sex offenders, N.J.S.A. 2C:47-3, and was apparently involved with A.H.B.'s treatment there. The record reflects, for example, that he assessed A.H.B.'s treatment and, at one time, recommended an anti-androgen medication to lower A.H.B.'s overall sexual arousal. A.H.B., however, was not interested in such a drug. In any event, the record does not reflect whether Dr. Harris had any connection with A.H.B.'s treatment at the STU or whether Correctional Medical Services provides treatment "appropriately tailored to address the specific needs of sexually violent predators." Consequently, the record will not support any finding that, under the SVPA, Dr. Harris was a member of A.H.B.'s treatment team. See N.J.S.A. 30:4-27.26.
We further note that neither of A.H.B.'s witnesses were psychiatrists. Both Dr. Carlson, Psy.D., who was employed by the STU, and Dr. Singer, Ph.D., who was retained by A.H.B. as his expert, are psychologists. The SVPA defines "psychiatrist" as "a physician who has completed the training requirements of the American Board of Psychiatry and Neurology." N.J.S.A. 30:4-27.26. Thus, on this record, only Dr. Zeiguer meets the specific witness requirement of N.J.S.A. 30:4-27.30b, and we disagree with the implication in In re Commitment of J.P., 339 N.J.Super. 443, 460, 772 A.2d 54 (App.Div.2001), that any "mental health professional" may meet this requirement.
We have previously indicated that "[t]he psychiatrist is the only person with the training as well as the knowledge from personal interviews with the committee, or potential committee, to determine if commitment is necessary, the level of treatment needed, and when recovery occurs." J.H.M., supra, 367 N.J.Super. at 610, 845 A.2d 139. The problem in this case, however, is that Dr. Zeiguer did not personally examine A.H.B. at all, thus failing to meet the requirement that he examine A.H.B. "as close to the hearing date as possible, but in no event more than five calendar days prior to the court hearing." N.J.S.A. 30:4-27.30.
When Judge Paley temporarily confined A.H.B. to the STU, on November 6, 2003, he substantially complied with the SVPA and set a hearing for December 2, 2003, to determine the "continuing need for involuntary commitment as a sexually violent predator within 20 days from the date of the temporary commitment order." N.J.S.A. 30:4-27.29a. However, the State did not conduct such a hearing until March 25, 2004. The reason for this extraordinary delay is not contained within the record. There is also no indication why the State did not provide at least documentary evidence of whatever services were offered A.H.B. at the STU during the over-four-month delay. See In re Civil Commitment of V.A., 378 N.J.Super. 1, 4, 873 A.2d 1269 (App.Div.2005).
Because of the extraordinary delay, A.H.B. claims Drs. Harris's and Zeiguer's opinions are based on aged information and do not satisfy the requirements of the SVPA. N.J.S.A. 30:4-27.30b. Accordingly, A.H.B. argues it was error for Judge Perretti to accept the opinions of Drs. Zeiguer and Harris over those advanced by Drs. Carlson and Singer, both of whom saw A.H.B. in the month of the commitment hearing.
The SVPA does not provide a remedy for the State psychiatrist failing to obtain a recent "personal examination." Obviously, the Legislature intended to protect prospective committees from being committed on the basis of stale evidence and to ensure that a physician member of the treatment team personally examines the prospective committee before commitment may occur. J.H.M., supra, 367 N.J.Super. at 610, 845 A.2d 139. Even though the SVPA does not provide a remedy, it is *1034 apparent to us that such a deviation from the statutory requirements would in most circumstances mandate a new hearing. However, such a result is not required in this instance.
We preliminarily note that this issue, as with all of the other issues A.H.B. raised on this appeal, was not presented to the trial court.[5] Therefore, we could reject the argument on this basis alone. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). However, because of the personal liberty interests at stake, we elect to consider the allegations of error under the plain error review standard. R. 2:10-2. Consequently, we move on to determine whether the alleged untimeliness of the State's evidence was clearly capable of producing an unjust result. See State v. Macon, 57 N.J. 325, 337-38, 273 A.2d 1 (1971).
The record reflects that Dr. Zeiguer attempted to examine A.H.B. on two occasions that were closer in time to the scheduled hearing. A.H.B., on the advice of counsel, refused to meet with the doctor and rejected both requests. Although Dr. Zeiguer failed to request an examination within the statutory time frame, we will not allow A.H.B. to reject examination and then complain about the State's failure to present more recent testimony, especially here where the State could reasonably infer from A.H.B.'s prior obstinacy that an additional request would have been similarly resisted.
A.H.B.'s attorney has not articulated the specific reason why he advised A.H.B. to refuse examination by Dr. Zeiguer.[6] Presumably, the attorney believed that either the federal or State protection against self-incrimination pertained in sexually violent predator proceedings.
Although civil commitment, with its "significant deprivation of liberty" is bounded by significant constitutional protections, W.Z., supra, 173 N.J. at 125-26, 801 A.2d 205, there is no general right under the Act to refuse examination by the State psychiatrist. N.J.S.A. 2A:84A-19(a) (providing that "no person has the privilege to refuse to submit to examination for the purpose of discovering or recording his... mental condition"); R. 4:19 (requiring mental examination of certain persons in civil actions); see also Allen v. Illinois, 478 U.S. 364, 375, 106 S.Ct. 2988, 2995, 92 L.Ed.2d 296, 308 (1986) (concluding that proceedings under the Illinois Sexually Dangerous Persons Act were not criminal within the meaning of the privilege against self-incrimination); see also In re Civil *1035 Commitment of G.A., 309 N.J.Super. 152, 163-64, 706 A.2d 1116 (App.Div.1998) (holding that a person who had been civilly committed, under N.J.S.A. 30:4-27.10, and on Conditional Extension Pending Placement when he was criminally charged with sexually assaulting a female patient, could be required to submit to an independent psychiatric examination without violating his protection against self-incrimination); Lewis v. Dep't. of Corr., 365 N.J.Super. 503, 506, 839 A.2d 933 (App.Div.2004) (revealing that the privilege against self-incrimination relating to a particular criminal conviction is extinguished after direct appeals are exhausted); State v. Szatmari, 163 N.J.Super. 418, 419, 394 A.2d 1254 (Law Div.1978) (recognizing that "[i]t is well settled that directing a defendant to submit to a psychiatric examination does not violate his constitutional rights against self-incrimination."). There is also no psychologist-patient privilege, N.J.S.A. 45:14B-28(a), N.J.R.E. 505, and no patient and physician privilege, N.J.S.A. 2A:84A-22.3(a) and N.J.R.E. 506.
Accordingly, we will not allow A.H.B. to benefit from his unjustified refusal to cooperate with Dr. Zeiguer. See State v. Logan, 244 N.J.Super. 137, 143, 581 A.2d 909 (Law Div.1990) (finding defendant can refuse "to cooperate with an evaluation to determine whether he falls within the purview of the [Sex Offender Act]," but by doing so waives due process rights), aff'd o.b., 262 N.J.Super. 128, 620 A.2d 431 (App.Div.), certif. denied, 133 N.J. 446, 627 A.2d 1150 (1993). Such a result is particularly appropriate in this case where A.H.B. presented the testimony of two psychologists, one of whom was employed by the STU and had last interviewed A.H.B. two days before trial, and the other about one week before the trial. Dr. Carlson, the State-employed psychologist, concluded from his interview with A.H.B., that A.H.B. had obtained greater benefit from treatment at Avenel than the Avenel termination report and State psychiatrists had identified. Dr. Singer claimed, in conflict with several other professionals, that A.H.B.'s interview indicated that A.H.B. had "grown from his [Avenel] sex-offender treatment experience. He demonstrates genuine empathy for his victims, remorse, and a relapse prevention plan." But neither Dr. Carlson nor Dr. Singer indicated that A.H.B.'s treatment or any other experiences he may have had during the almost five months between Dr. Harris's interview on October 28, 2003, and the trial on March 25, 2004, reduced the clinical basis for involuntary commitment of A.H.B. Instead, Drs. Carlson and Singer simply gave more credence to A.H.B.'s explanations than did all the other medical care providers who had previously examined him. In short, the judge had before her evidence derived from recent personal examinations of A.H.B., but simply found the testimony unpersuasive.
We conclude, after considering all of the evidence in this record, that there was ample support for the court to direct commitment and that Judge Perretti did not abuse her discretion by committing A.H.B. See J.P., supra, 339 N.J.Super. at 459, 772 A.2d 54. The absence of a timely examination by the State's psychiatrist, even if we assume that it constituted error, could not have led to an unjust result when considered in conjunction with the entire record and the pertinent circumstances that caused the failure of proof. R. 2:10-2. In addition, it is difficult to ignore that by this date, assuming A.H.B. remains committed, he should have received at least two further annual reviews to determine "the need for [continued] involuntary commitment." N.J.S.A. 30:4-27.35.
Affirmed.
NOTES
[1] Heather Burnett scored both tests, which were administered on June 9, 2003.
[2] The commitment hearing was originally scheduled by Judge Paley for December 2, 2003. The record does not indicate the cause of the over-four-month delay.
[3] The record does not indicate precisely what date the court had scheduled for trial at the time Dr. Zeiguer made his two attempts to interview A.H.B., but there is some evidence in the record that a hearing had been scheduled for sometime in January.
[4] Dr. Singer's report indicates the interviews took place "Tuesday, March 2, 2003 ... and again Tuesday, March 9, 2004." Based on a review of the record, and because March 2, 2003 fell on a Sunday, we assume the year identified in the report was a typographical error.
[5] The closest the judge came to considering this issue was when the State moved to preclude Dr. Singer's testimony, because A.H.B. had refused to submit to any examination by Dr. Zeiguer, and the judge declined to take such action because "the State had the benefit of the three to four hour interview [of A.H.B. by Dr. Harris]."
[6] Dr. Zeiguer advised A.H.B. that he could refuse examination. After the date A.H.B.'s appeal was submitted to us for decision, we asked Dr. Zeiguer, through counsel, the reason for that advice. Dr. Zeiguer responded that he provided this advice because of the need for cooperation and informed consent in any psychiatric interview. We note that the American Academy of Psychiatry & the Law, Ethical Guidelines for the Practice of Forensic Psychiatry, § III-Consent p. 2 (rev.1995) advises "[t]he informed consent of the subject of a forensic evaluation is obtained when possible." The comments to that section provide, in part, that "[i]t is important to appreciate [however] that in particular situations, such as ... involuntary commitment, consent is not required. In such cases the psychiatrist should so inform the subject and explain that the evaluation is legally required and that if the subject refuses to participate in the evaluation, this fact shall be included in any report or testimony." Ibid. In any event, the record reflects that A.H.B. declined to be interviewed solely because of his own counsel's advice and not because of any advice by Dr. Zeiguer.