# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1771-24

IN THE MATTER OF THE
CIVIL COMMITMENT OF
S.W.H. SVP-836-23.

_____

Argued December 16, 2025 – Decided March 30, 2026

Before Judges Susswein and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. SVP-836-23.

Michael Denny, Assistant Deputy Public Defender, argued the cause for appellant S.W.H. (Jennifer N. Sellitti, Public Defender, attorney; Michael Denny, of counsel and on the brief).

Stephen Slocum, Deputy Attorney General, argued the cause for respondent State of New Jersey (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen and Sookie Bae-Park, Assistant Attorneys General, of counsel; Stephen Slocum, on the briefs).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

Appellant S.W.H.[1] appeals the January 30, 2025, Law Division order committing him to the Special Treatment Unit (STU) pursuant to the Sexually Violent Predator Act (SVPA or Act), N.J.S.A. 30:4-27.24 to -27.38. After reviewing the record in light of the governing legal principles, we conclude that the commitment order is supported by substantial credible evidence, including expert testimony. We therefore affirm.

I.

We discern the following pertinent facts and procedural history from the record. As a juvenile, S.W.H. was placed on probation on May 13, 1971, for breaking and entering. His probation was extended for one year due to disorderly conduct.

S.W.H. was arrested as an adult on January 30, 1974, and charged with three counts of robbery, robbery while armed, rape, rape while armed, two counts of atrocious assault and battery, and one count of murder. The incidents occurred on separate dates and involved attacks by S.W.H. and a co-defendant against three victims. In the final incident, which occurred on or about January 29, 1974, S.W.H. and a co-defendant forced a female taxi driver to drive to a

---

[1] We use initials to maintain the confidentiality of these proceedings. R. 1:38-5(a).

secluded location at knife point where they robbed her, sexually assaulted her, and beat her with a wooden board until she died. S.W.H. pled guilty to murder, atrocious assault and battery, and two counts of robbery. He was sentenced to an aggregate term of thirty to forty-five years in state prison.

In October 1978, while in prison, S.W.H. was charged with threatening a nun and was given a year in administrative segregation. A 1981 notation in his record indicates that he was not to have any contact with female staff or volunteers because of inappropriate correspondence he sent to a female staff member. He was returned to the general prison population in October 1981 but became romantically involved with a female staff member, contrary to the conditions of release whereupon he was placed in the Vroom Readjustment Unit. He was returned to the general population in 1987 and eventually transferred to Riverfront Prison in Camden. S.W.H. was paroled on July 16, 1991.

On September 22, 1991, while on parole supervision, S.W.H. kidnapped and sexually assaulted a forty-five-year-old woman. S.W.H. saw a "for sale" sign at the home occupied by the victim and asked to tour the house. He lured the victim into the back bedroom where he struck her over the head with a hatchet-hammer he had concealed in his jacket. He proceeded to sexually assault the victim and threatened to kill her if she fought back. He then ordered

A-1771-24

her to clean up the crime scene. S.W.H. drove the victim to a secluded area and forced her out of the vehicle, repeatedly hitting her in the head. He attempted to tie her to a tree in a wooded area. When he was unsuccessful at tying her to the tree, S.W.H. ordered the victim back into the vehicle and made her drive them back to her home. He attempted to wipe his fingerprints from the vehicle. Police later recovered S.W.H.'s baseball cap in the bedroom along with other physical evidence found in the victim's home and the vehicle.

S.W.H. was arrested on September 25, 1991, and charged with attempted murder, aggravated assault, three counts of aggravated sexual assault, terroristic threats, possession of a weapon for an unlawful purpose, kidnapping, witness tampering, and tampering with evidence. He was convicted by a jury of all counts except attempted murder. On April 16, 1993, he was sentenced to sixty years in prison with thirty years parole ineligibility. His sentence was later reduced on remand to fifty years with twenty-five years parole ineligibility.

The State at the commitment hearing also presented evidence of institutional infractions while S.W.H. was incarcerated. On September 28, 1993, S.W.H. sent a letter to the victim's eighteen-year-old stepdaughter threatening to subpoena members of her family and denying the allegations against him, referring to the victim as "an alleged whore" and "a slut." He also

4

sent several antisemitic and sexually derogatory letters to the female prosecutor who tried his case. S.W.H. also made statements to a fellow inmate regarding his plan to "rape and murder" the judge who presided over his criminal proceedings.

In 2016, a New Jersey State Police Detective contacted South Woods State Prison and reported that S.W.H. had been sending excessive unwanted mail to Superior Court judges and was ordered to have no further contact with them. S.W.H. was issued a complaint-summons after contacting judges in violation of the no contact order and was charged with two counts of harassment. On April 25, 2018, following additional threatening correspondence to Superior Court judges and court staff, S.W.H. was charged with four counts of harassment, three counts of contempt, and two counts of stalking. He was found guilty and sentenced to two years to run concurrently with his existing prison sentence.

In an April 18, 2019, letter to the New Jersey Supreme Court, S.W.H. described his intent to file a self-represented lawsuit against the three Appellate Division judges who heard his post-conviction relief case, indicating that he had conducted background checks on the judges and intended to take legal action to place a stoppage on their pensions. On June 10, 2019, an incident report was filed complaining that S.W.H. had written to the Appellate Division Clerk's

Office five times regarding his intention to file a lawsuit against the Appellate Division panel who considered his case, stating he would subpoena the Clerk and other members of the court for evidentiary purposes. On October 21, 2019, S.W.H. sent correspondence to a judiciary employee including his parole dates with menacing representations regarding his parole.

In 2023, when S.W.H. became eligible for release, the State petitioned to involuntarily civilly commit him pursuant to the SVPA. The initial commitment hearing was held on January 30, 2025. S.W.H. was sixty-eight years old at the time. At the hearing, the State presented two expert witnesses: psychiatrist Dr. Michael Kunz, M.D., and psychologist Dr. Jamie Canataro, Psy.D. S.W.H. presented psychologist Dr. Christopher P. Lorah, Ph.D. and testified on his own behalf.

Dr. Kunz testified that S.W.H. "has an enduring pattern of hostility against women," and diagnosed him with antisocial personality disorder. Dr. Kunz concluded that, because of the antisocial personality disorder, S.W.H. suffers from a mental abnormality or personality disorder that affects him emotionally, cognitively, and volitionally so as to predispose him to sexual violence. Dr.

A-1771-24

Kunz scored S.W.H. at a four on the Static-99R[2] actuarial tool, placing "him in a category of above average risk for sexual reoffending." Dr. Kunz testified that the Static-99R partially accounted for S.W.H.'s age. He further testified that S.W.H. scored a fifteen on the Stable-2007,[3] "which would be characterized as high." Dr. Kunz classified S.W.H.'s risk for re-offense as high if not confined.

The State's psychologist, Dr. Canataro, likewise diagnosed S.W.H. with antisocial personality disorder. Dr. Canataro also utilized the Static-99R and Stable-2007 risk measurement tools, scoring S.W.H. at a five and a twelve respectively, placing him in a high-risk category for re-offense. Dr. Canataro also utilized a Hare Psychopathy Checklist-Revised, used to rate a person's psychopathic or antisocial tendencies, and found S.W.H. scored a thirty, indicating psychopathic personality traits. Dr. Canataro opined that S.W.H. was at high risk of re-offense and recommended that he be committed to the STU. Dr. Canataro acknowledged that S.W.H. had spent twenty-two months in sex

---

[2] The Static-99 is an actuarial risk prediction instrument designed to estimate the probability of sexual and violent reconviction for adult males who have already been charged with or convicted of at least one sexual offense against a child or a non-consenting adult.

[3] The STABLE-2007 is a 13-item dynamic risk assessment that predicts risk in adult male sex offenders in five recidivism categories: overall, sexual, sexually violent, violent, and breaches (violation behaviors).

A-1771-24

offender treatment at the Adult Diagnostic and Treatment Center (ADTC) as part of his criminal sentence but noted that the ADTC termination report indicated that he was still in the beginning stages of sex offender treatment, given the "minimization of his behaviors."

S.W.H.'s expert, Dr. Christopher Lorah, testified that he had interviewed S.W.H. three times and, like the State's expert witnesses, diagnosed him with antisocial personality disorder. Dr. Lorah found no indication of violent activity while incarcerated other than a weapons infraction in 2017. Dr. Lorah testified that while S.W.H.'s letters while incarcerated were "rude, uncouth, and would be upsetting to [him] if [he] received them," they did not, in his opinion, represent evidence of sexual dangerousness. Dr. Lorah scored S.W.H. at a five on the Static-99R and testified that recidivism rates associated with that score after five years are eleven and twelve percent, and that after ten years that rate increases to twenty percent. Dr. Lorah further testified that there is a significant reduction in risk of re-offense with advanced age. Dr. Lorah opined that S.W.H.'s "risk to sexually reoffend in the foreseeable future will fall below the highly likely level if not confined to a secure facility." He also testified that the Static-99R range "accurately reflects" S.W.H.'s recidivism risk. Dr. Lorah

A-1771-24

recommended that S.W.H. receive outpatient sex-offender-specific treatment, rather than be civilly committed to a secure facility.

S.W.H. testified regarding his efforts at rehabilitation including participating in the New Jersey Scholarship and Transformative Education in Prisons (NJ-STEP) program[4] and his desire to enter sex offender treatment as early as 2011. He further testified that he should be viewed as having committed only one rape by himself—the 1991 abduction, rape, and beating of the victim—because "[t]he other two rapes [were] the result of [him] being a follower" of his co-defendant. S.W.H. testified regarding his desire to re-enter the community as a board-certified funeral director. He further testified regarding his medical conditions, including his diagnosis of Multiple Sclerosis, diabetes, and his failure to maintain an erection in thirteen years.

Immediately following the hearing, the commitment court rendered an oral opinion. The court noted that S.W.H.'s psychiatric diagnosis of antisocial personality disorder meets the criteria for mental abnormality as defined by

---

[4] The NJ-STEP program is an association of higher education institutions in New Jersey working in partnership with the State of New Jersey Department of Corrections and New Jersey State Parole Board to (a) provide higher education courses toward a college degree for students while they are incarcerated, and (b) to assist in their transition to college life upon release from prison. Prison Studies Project, NJ Step, https://prisonstudiesproject.org/nj-step/ (last visited Dec. 29, 2025).

A-1771-24

N.J.S.A. 30:4-27.26. Relying on the expert testimony of Dr. Kunz and Dr. Canataro, the court found that S.W.H.'s scoring on the Static-99R and Stable-2007 places him at an above-average risk for sexual recidivism. Finally, the commitment court noted that S.W.H.'s current phase in treatment is phase two. Accordingly, the court found that all three elements of the SVPA were met by a clear and convincing evidence standard. The commitment court enumerated the three statutory elements:

> One, the predicate offense as defined under the SVPA exists, and I have read those into the record. Two, the resident suffers from mental abnormality or personality disorder, in this case antisocial personality disorder. And it is highly likely the resident will sexually reoffend. Therefore . . . I find that [S.W.H.] is highly likely to sexually reoffend, and must be committed to the [STU], for further treatment.

Prior to the conclusion of the hearing defense counsel pointed out that the court had failed to reference defense expert Dr. Lorah's opinion. The commitment court responded that it agreed with the State's experts and noted that Dr. Lorah scored S.W.H. at a five on the Static-99R level, placing him at an above-average risk for re-offense, consistent with the State's experts.

This appeal follows. S.W.H. raises the following contention for our consideration in his counseled appeal brief:

A-1771-24

THE COMMITMENT COURT SHOULD NOT HAVE COMMITED S.W.H. BECAUSE THE STATE FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT HE WAS HIGHLY LIKELY TO SEXUALLY REOFFEND IF NOT CIVILLY COMMITTED.

S.W.H. raises the following additional contention in his self-represented brief:

THE CIVIL COMMITMENT COURT MISTAKENLY ERRED WHEN IT INVOLUNTARILY CIVILLY COMMITTED S.W.H. WHICH VIOLATED HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO FUNDAMENTAL FAIRNESS, EQUAL PROTECTION, DUE PROCESS, AND TO A REMEDY OF LAW. (Not raised below).

II.

We begin our analysis by acknowledging the legal principles governing this appeal. "'The scope of appellate review of a commitment determination is extremely narrow.'" In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting Matter of D.C., 146 N.J. 31, 58 (1996)). "[A]n appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" R.F., 217 N.J. at 175 (citing D.C., 146 N.J. at 58). "So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed." Ibid. (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

11

Deference to the commitment court is required because "[t]he judges who hear SVPA cases generally are 'specialists' and 'their expertise in the subject' is entitled to 'special deference.'" Id. at 174 (quoting In re Civ. Commitment of T.J.N., 390 N.J. Super. 218, 226 (App. Div. 2007)). Likewise, we "give deference to the findings of our trial judges because they have the 'opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting Johnson, 42 N.J. at 161).

"The appropriate inquiry is to canvass the significant amount of expert testimony in the record and determine whether the lower courts' findings were clearly erroneous." D.C., 146 N.J. at 58-59 (citing State v. Fields, 77 N.J. 282, 311 (1978)). However, "[t]he final decision whether a person previously convicted of a sexually violent offense is highly likely to sexually reoffend 'lies with the courts, not the expertise of psychiatrists and psychologists. Courts must balance society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy.'" R.F., 217 N.J. at 174 (quoting D.C., 146 N.J. at 59). "The ultimate decision on dangerousness is, therefore, a legal one, not a medical one, even though it is guided by medical expert testimony." D.C., 146 N.J. at 59 (citing In re Newsome, 176 N.J. Super. 511, 516 (App. Div. 1980); State v. Krol, 68 N.J. 236, 261 (1975)).

12

Turning to substantive legal principles, under the SVPA, "a person previously convicted of a sexual offense can be civilly committed only if the State can establish by clear and convincing evidence that he suffers from a mental abnormality or personality disorder that makes him highly likely to commit a sexually violent offense." R.F., 217 N.J. at 156. At the commitment hearing, the State must establish the following elements by clear and convincing evidence: (1) that the individual has been convicted of a sexually violent offense, N.J.S.A. 30:4-27.26; (2) that he suffers from a mental abnormality or personality disorder, ibid.; and (3) "that as a result of his psychiatric abnormality or disorder, 'it is highly likely that the individual will not control his or her sexually violent behavior and will reoffend.'" R.F., 217 N.J. at 173 (quoting In re Commitment of W.Z., 173 N.J. 109, 130 (2002)).

As for the second prong, "'[m]ental abnormality' means a mental condition that affects a person's emotional, cognitive or volitional capacity in a manner that predisposes that person to commit acts of sexual violence." N.J.S.A. 30:4-27.26. "[T]he nomenclature of 'mental abnormality' or 'personality disorder' is not dispositive. What is important is that . . . the mental condition must affect an individual's ability to control his or her sexually harmful conduct." W.Z., 173 N.J. at 127. "[T]he diagnosis of each sexually violent predator susceptible

13

to civil commitment need not include a diagnosis of 'sexual compulsion.'" <u>Id.</u> at 129.

The third prong of the Act "is explained to mean that 'the propensity of a person to commit acts of sexual violence is of such a degree as to pose a threat to the health and safety of others.'" <u>Id.</u> at 129-30 (quoting N.J.S.A. 30:4-27.26). "To discharge an individual, a court must find that 'the person will not be likely to engage in acts of sexual violence because the person is amenable to and highly likely to comply with a plan to facilitate the person's adjustment and reintegration into the community.'" <u>Id.</u> at 128 (quoting N.J.S.A. 30:4-27.32). "Clearly the Legislature intended that there be a 'loss of control' requirement in the SVPA." <u>Ibid.</u> Our Supreme Court has interpreted the requisite lack of control "as requiring a substantial inability to control conduct." <u>Ibid.</u>

III.

We next apply these basic principles to the present facts. S.W.H. contends in his counseled brief that the commitment court erred in civilly committing him because the State failed to prove by clear and convincing evidence that he was highly likely to sexually re-offend if not committed. Specifically, S.W.H. challenges the second and third prong of the SVPA, maintaining that the State failed to meet its burden in proving S.W.H.'s particular risk to reoffend.

14

S.W.H. raises the following arguments in support of his assertion that the State failed to meet its burden: (1) the State's expert, Dr. Canataro, improperly testified as a lay opinion witness because her testimony was unscientific and subjective and therefore should be stricken from the record; (2) the commitment court failed to properly consider S.W.H.'s age and correlating reduced recidivism rate; (3) the commitment court failed to consider S.W.H.'s medical problems, which mitigate his risk of re-offense; (4) the diagnosis of anti-social personality disorder is insufficient to meet the criteria under the SVPA because it is not associated with increased risk of sexual violence; (5) the commitment court failed to consider S.W.H.'s behavior over the last seven years, demonstrating his ability to conform to rules; and (6) S.W.H.'s denial and minimization of his crimes does not demonstrate that he has an increased risk of sexual recidivism.

We are not persuaded by any of these contentions. We are satisfied that the commitment court properly enumerated the three requisite elements for commitment under the SVPA. The court began by identifying that S.W.H. had been convicted of a sexually violent offense, noting his September 27, 1974, conviction for murder, atrocious assault and battery, and robbery, as well as his September 22, 1991, conviction of three counts of aggravated sexual assault,

15

aggravated assault, terroristic threats, possession of a weapon for unlawful purpose, kidnapping, witness tampering, and tampering evidence.

Next, the court found that S.W.H.'s psychiatric condition "meets the criteria for mental abnormality as defined by N.J.S.A. 30:4-27.26," satisfying the second prong of the SVPA. S.W.H. argues that the diagnosis of anti-social personality disorder is insufficient to meet the criteria under the SVPA because it is not associated with increased risk of sexual violence. However, the commitment court's conclusion was supported by testimony from Dr. Kunz and Dr. Canataro, who diagnosed S.W.H. with anti-social personality disorder and opined that he is suffering from a mental abnormality or personality disorder that affects him emotionally, cognitively, and volitionally as to predispose him to sexual violence. Even S.W.H.'s expert, Dr. Lorah, while concluding that anti-social personality disorder is not typically associated with sexual violence, conceded that "empirically there is a relationship between antisocial characteristics and sexual recidivism."

We are satisfied that the commitment court's conclusion that S.W.H.'s diagnosis of anti-social personality disorder meets the second prong of the SVPA is amply supported by the record. Moreover, "[w]hat is important is that . . . the mental condition must affect an individual's ability to control his or her

16

sexually harmful conduct." W.Z., 173 N.J. at 127. Dr. Canataro concluded that, because of his diagnosis, S.W.H. would have "serious difficulty controlling his sexually violent behavior if not committed to the STU."

We add that the commitment court considered Dr. Kunz and Dr. Canataro's testimony regarding S.W.H.'s scoring on the Static-99R and Stable-2007, placing him in an above-average risk category for future offense. The commitment court also noted S.W.H.'s current treatment phase, placing him in the early stages of his sex offender treatment. S.W.H. contends that the Static-99R and Stable-2007 are generalized instruments that do not accurately reflect S.W.H.'s individualized risk of re-offense. However, "actuarial information, including the Static-99, is 'simply a factor to consider, weigh, or even reject, when engaging in the necessary factfinding under the SVPA.'" R.F., 217 N.J. at 164 n.9 (quoting In re Commitment of R.S., 173 N.J. 134, 137 (2002)). We conclude that the commitment court acted well within its fact-finding discretion in weighing S.W.H.'s scores on these tools in its assessment of his risk of re-offense.

Nor are we persuaded by S.W.H.'s contention that the commitment court gave no reason for discrediting Dr. Lorah's testimony that S.W.H. was not likely to reoffend, instead finding that the State's expert witnesses were more

17

persuasive. The law is well-settled that "[a] trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety." Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002) (citing Carey v. Lovett, 132 N.J. 44, 64 (1993)). See also R.F., 217 N.J. at 174 (quoting D.C. 146 N.J. at 61) (In a civil commitment hearing, "[a] trial judge is 'not required to accept all or any part of [an] expert opinion.'"). Moreover, the commitment court explained that it considered Dr. Lorah's scoring of S.W.H. at a five on the Static-99R level, placing him at an above-average risk for re-offense, consistent with the State's experts.

S.W.H.'s argument that the commitment court should not have considered Dr. Canataro's testimony likewise lacks merit. S.W.H. argues that Dr. Canataro testified to using a personal opinion to measure S.W.H.'s risk of re-offense. Specifically, she testified that "[w]e're answering a broader question than the probability when we are answering if he is highly likely to sexually reoffend." She further explained: "we often use an example of if someone is a flasher and their risk is [eighty] percent, would someone feel more comfortable letting this person go than an individual who is a homicidal serial rapist with a probability of one percent?"

S.W.H.'s argument misconstrues the record, which demonstrates that Dr. Canataro testified to using a holistic approach to analyze whether an individual is highly likely to sexually reoffend. There is nothing in the record indicating that the commitment court relied on Dr. Canataro's comments regarding the seriousness of the offense to support its decision to civilly commit S.W.H. Thus, the commitment court did not commit error by considering Dr. Canataro's testimony.

IV.

We turn next to S.W.H.'s arguments concerning mitigating factors and his contention that the commitment court failed to properly weigh them. S.W.H. contends, for example, that the court failed to consider his age and medical conditions. Those arguments are belied by the record, which shows that the commitment court, in considering the expert testimony, accounted for S.W.H.'s age and medical conditions. Dr. Kunz opined that S.W.H. remains physically capable of sexually reoffending against his victim pool despite his medical conditions because he can ambulate well and appears "physically agile." Likewise, Dr. Canataro testified that S.W.H.'s "antisociality remains strong, which is the motivator for sexual offending behaviors, and it continues at his age of [sixty-eight]."

19

The commitment court also considered S.W.H.'s testimony regarding his behavior while incarcerated and his desire to rehabilitate himself. Notably, the expert testimony discussed S.W.H.'s repeated infractions while incarcerated, including his letter writing. For example, Dr. Kunz characterized the letters as "offensive or misogynistic, antisemitic, [and] harassing."

Furthermore, all three experts noted the significance of the fact that S.W.H. reoffended while on parole for only two months. Dr. Kunz explained, "the significance is that he had just finished serving time, many years, for his prior offenses . . . and this didn't deter him from committing another sexual and violent offense. And that is relevant in terms of his ability to respond to supervision, respond to deterrence."

On this record, we conclude that the commitment court considered the pertinent factors and did not commit a "clear mistake" warranting our intervention. See R.F., 217 N.J. at 175 (quoting Johnson, 42 N.J. at 162) ("So long as the trial court's findings are supported by 'sufficient credible evidence present in the record,' those findings should not be disturbed.").

V.

We likewise are unpersuaded by S.W.H.'s argument that his minimization of his crimes does not demonstrate a risk of recidivism. This argument again

A-1771-24

misconstrues the record, which shows that both Dr. Kunz and Dr. Canataro opined that S.W.H. requires additional sex offender treatment to control his impulses and reduce his risk of re-offense. As Dr. Kunz explained, accountability for one's actions is part of sex offender treatment and "[S.W.H.] is not yet at the point where I think he fully is able to face and explain . . . what happened during these offenses." We are satisfied that the commitment court did not err in considering S.W.H.'s minimization of his crimes.

## VI.

In his self-represented brief, S.W.H. contends that the commitment court violated his state and federal constitutional due process rights by committing a series of errors that essentially deprived him of a fair hearing. Specifically, he contends: (1) that the State failed to proffer expert testimony from a member of his treatment team; (2) that the failure to merge his convictions resulted in a cumulative effect during his commitment hearing; (3) that the commitment court erred in failing to place its findings of fact on the record and in relying on hearsay documents; (4) that he should not be committed under the SVPA because he did not serve his criminal sentence at the Adult Diagnostic and Treatment Center (ADTC); (5) that the commitment court failed to resolve various objections raised by his counsel during the commitment hearing; and (6)

that the commitment court failed to recognize that he has been infraction free since 2018. None of these contentions have merit, and we address them in turn.

S.W.H. argues that the State could not prove by clear and convincing evidence that he met the criteria for confinement under the SVPA because there was no expert testimony from anyone on his treatment team. We rejected a similar argument in In re Civ. Commitment of A.H.B., 386 N.J. Super. 16, 25 (App. Div. 2006). In that case, A.H.B. appealed his civil commitment contending that the State's psychiatrist was not a member of his treatment team. Ibid. We explained, "the SVPA defines '[t]reatment team' as including 'individuals, agencies or firms which provide treatment, supervision or other services at a facility designated for the custody, care and treatment of sexually violent predators.'" Ibid. (quoting N.J.S.A. 30:4-27.26). "Thus, the SVPA more broadly defines the 'treatment team' to include not only individuals but also 'agencies or firms.'" Ibid. In the present matter, Dr. Canataro testified on behalf of the STU and her testimony satisfies the statutory requirement.

S.W.H. next argues that failure to merge his convictions resulted in a prejudicial cumulative effect during his commitment hearing. He maintains that the commitment court treated his 1991 offense as if he had committed three separate sexual assault offenses, when in fact he had only been convicted of one

22

sexual assault.  This argument lacks merit.  The first prong of the SVPA requires proof that the individual has been convicted of a sexually violent offense. N.J.S.A. 30:4-27.26.  That element was clearly satisfied here.  Furthermore, it is undisputed that S.W.H. was originally convicted of murder, atrocious assault and battery, and robbery for his 1974 offenses, and later convicted of aggravated sexual assault, among other charges, related to the 1991 sexual assault.  In sum, these convictions clearly satisfy the first prong of the SVPA and support the commitment court's conclusion.

S.W.H. next contends that the commitment court failed to place its factual findings on the record and erred by considering hearsay documents.  While the commitment court's oral opinion is concise, the court sufficiently placed its reasoning on the record, explaining that it agreed with the State experts' opinions, which in turn were supported by a robust record.  Furthermore, the commitment court enumerated the requisite elements under the SVPA, finding the State's evidence established all of them.

Likewise, the commitment court did not err in considering hearsay documents because "reports and documents normally relied upon by psychiatrists or psychologists to determine if the committee is a sexually violent predator are admissible."  In re Civil Commitment of J.M.B., 395 N.J. Super.

69, 95 (App. Div. 2007) (citing In re Civil Commitment of A.E.F., 377 N.J. Super. 473, 492 (App. Div. 2005)). Here, the documents that S.W.H. argues were inadmissible hearsay were relied upon by all three experts to form their opinions and thus were properly considered.

We also are unpersuaded by S.W.H.'s contention with respect to his letter-writing activity that he is being improperly punished for exercising his First Amendment rights. The SVPA contemplates that when written notice is given to the Attorney General that a person may meet the criteria of a sexually violent predator, the agency with jurisdiction shall provide the Attorney General's office with all information relevant to that determination, regardless of confidentiality. See N.J.S.A. 30:4-27.27(b). The letters were relevant to the determination of whether S.W.H. met the criteria of a sexually violent predator according to the Act and were thus properly considered by the commitment court.

S.W.H.'s contention that he should not be committed under the SVPA because he did not serve his criminal sentence at the ADTC also fails. Our Supreme Court rejected a substantially similar argument in In re Civ. Commitment of W.X.C., holding, "[w]e decline to conclude that the SVPA is transformed into a punitive, and therefore unconstitutional, enactment merely

because it applies to some individuals, like defendant, who were not provided with specialized treatment prior to civil commitment." 204 N.J. 179, 195 (2010).

Finally, we address S.W.H.'s argument that because he has not been charged with an institutional infraction since 2018—when he was convicted of harassment—he is not highly likely to commit another sexual crime. We reiterate and stress that—as noted by all three experts—the last time S.W.H. was released into the community, he committed a violent rape within two months of his release and while on parole supervision. We are satisfied that the record supports the commitment court's ultimate finding that S.W.H. was highly likely to reoffend if released. We decline to substitute our judgment for the commitment court's in weighing the risk that S.W.H. would offend yet again if released into the community. See D.C., 146 N.J. at 58-59 (citing State v. Fields, 77 N.J. 282, 311 (1978)) ("The appropriate inquiry is to canvass the significant amount of expert testimony in the record and determine whether the lower courts' findings were clearly erroneous.").

To the extent we have not specifically addressed them, or have addressed them only briefly, any remaining arguments raised by S.W.H. lack sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1771-24