# RECORD IMPOUNDED

---

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0895-24

IN THE MATTER OF THE
COMMITMENT OF A.W.[1]

_____

Submitted April 15, 2026 – Decided May 11, 2026

Before Judges Vanek and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 07-05-0667.

Jennifer N. Sellitti, Public Defender, attorney for appellant A.W. (Ian P. Liberty, First Assistant Deputy Public Defender, of counsel and on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent State of New Jersey (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

---

[1] Consistent with the parties' submissions, we refer to appellant by his initials.

A.W. appeals from an October 17, 2024 Law Division order continuing his involuntary commitment, alleging his due-process rights were violated during a Krol[2] review hearing. Discerning no plain error, we affirm.

I.

In 2006, A.W. set fires at a church and its assistant pastor's home. In 2007, he was found not guilty by reason of insanity (NGI) on all charges, including two counts of aggravated arson in the first degree, two counts of risking widespread injury or damage in the fourth degree, and four counts of criminal mischief in the fourth degree. Had he been convicted, A.W. would have been subject to a maximum term of forty years of incarceration.

Once acquitted, A.W. was committed to the Anne Klein Forensic Center. He had a psychiatric history of schizophrenia, paranoid type; anxiety disorder—not otherwise specified; personality disorder—not otherwise specified with antisocial traits; coupled with a history of cannabis, cocaine, LSD, ecstasy, heroin, and alcohol abuse. In 2010, A.W. was transferred to Greystone Park Psychiatric Hospital, a less restrictive facility. In 2021, he was briefly returned

---

[2] State v. Krol, 68 N.J. 236 (1975) (requiring a trial court to hold periodic hearings at which the State must prove an acquittee poses a danger to themselves or society in order to continue commitment).

A-0895-24

to Anne Klein after violating his commitment order. In 2022, he was transferred back to Greystone.

After a <u>Krol</u> review hearing in October 2023, the trial court ordered A.W.'s transfer to the "cottages," an open unit separate from the main building at Greystone. At the next <u>Krol</u> hearing in May 2024, the court ordered A.W. remain under observation in the cottages for three months before moving forward with discharge planning.

According to treating psychiatrist Dr. Ravi Baliga, A.W.'s behavior changed after the May hearing—he stopped attending some groups group therapy sessions, was seen using a contraband cellphone, and had in his possession several contraband credit cards, debit cards, and cancelled checks. The items were confiscated, and A.W. was informed they were contraband. Later, after staff confiscated more contraband, A.W. was informed he had violated rules governing the use of Greystone-issued flip phones. A.W. threatened Greystone staff, used racial slurs, and reported that a staff-member had made "sexual advances towards him." A.W. later withdrew that complaint.

In July, after Dr. Baliga informed the court of A.W.'s behavior, the judge ordered A.W. be returned to a closed unit in the main building at Greystone, and his level of supervision (LOS) raised to one, the highest level with the fewest

A-0895-24

privileges. The judge scheduled A.W.'s next <u>Krol</u> hearing for September 27, 2024, and ordered Dr. Baliga to submit an updated psychiatric evaluation.

Returning to the main building, A.W. remained under the care of Dr. Baliga in the Admissions Unit until July 30, when he was transferred to Dr. Rebecca Tennis's care in the Forensics Unit. According to Dr. Tennis, A.W. was "calm, cooperative, and in behavioral control and compliant with medications" while in the Admissions Unit. Once in the Forensics Unit, A.W. exhibited continued compliance with medications and attended 75% of group therapy meetings. Dr. Tennis reported that although patients were seen entering A.W.'s room in September 2024, that behavior ceased when A.W. was informed it was a violation of the unit's rules.

Ahead of the September 27 hearing, Drs. Tennis and Baliga submitted psychiatric evaluations. Both doctors affirmed A.W.'s diagnoses, noted his history of "impulsive behavior," and recommended he remain on <u>Krol</u> status and be subject to their discretionary lessening of the LOS. Dr. Tennis also recommended another <u>Krol</u> review hearing be held in three months.

Drs. Baliga and Tennis testified at the September 27 hearing. On direct examination, Dr. Baliga testified A.W. had become irritable and belligerent, leading to his removal from the cottages and transfer to an LOS-one closed unit

4

after he had received contraband and reacted negatively to being told he was violating the cottages' cellphone policy and that his preferred food was not available. A.W. responded by hurling racial slurs at the staff, threatening to have staff fired, unjustly claiming neglect and sexual abuse, and threatening to report staff to the police for enforcing the rules.

On cross-examination, Dr. Baliga was asked about his knowledge of Greystone's policies and A.W.'s violations. Dr. Baliga responded that he had not read Greystone's rules, but he was told the receipt of contraband debit cards was a violation. Concerning A.W.'s LOS, Dr. Baliga testified that he had not recommended in July that A.W. be returned to LOS one, the highest level—he had recommended A.W. be returned to LOS three, the lowest level.

After cross-examination, the judge asked Dr. Baliga to describe A.W.'s offensive interaction with Greystone staff in greater detail and stated the court would hold a "full-blown hearing with witnesses" if A.W. denied the allegations. Dr. Baliga confirmed this behavior occurred after the May hearing, at which the judge stated she "was going to be very, very careful about" A.W.'s discharge.

Dr. Tennis testified consistently with Dr. Baliga, describing A.W.'s "very rude and . . . racist comments toward the staff" as well as his occasionally "irritable and belligerent" behavior. Dr. Tennis added that A.W.'s "judgment

A-0895-24

[was] variable," meaning "there's times when . . . he's made bad decisions." She added that although A.W. no longer had delusions, he sometimes appeared anxious. But his thinking was "linear and logical," and he did not have thoughts of hurting himself or others. Dr. Tennis also noted A.W. had been recently diagnosed with narcissistic personality disorder, a diagnosis not reflected in earlier Krol hearing records. During cross-examination, Dr. Tennis testified A.W. did not need to be placed in the cottages but instead should have been moved to an "APlus group home, where he would still have [twenty-four]-hour supervision [and] . . . would benefit from a different environment."

After Dr. Tennis's testimony, the parties submitted their requested dispositions to the judge: A.W.'s attorney requested the judge adopt the psychiatrists' recommendations in full and give the treatment team discretion to move A.W. to an appropriate LOS; the State recommended A.W. remain on the highest LOS with a three-month review. A.W.'s counsel did not request his client's removal from Krol status or discharge planning.

The judge then issued an oral ruling, finding there was "no doubt, as a result of underlying mental illness, [A.W.] [was] a danger to himself or others if he is not within the confines of a locked unit." Referring to A.W.'s racial insults to minority staff members as "rude," "vicious," and "horrible" and A.W.'s

6

recanted accusations that staff had sexually abused him, the judge expressed concern about A.W.'s behavior and stability. However, the judge granted A.W.'s treating physicians the discretion to adjust his LOS subject to approval of the required state agencies. The judge stated she would not consider discharge planning until there was a "long period of . . . reasonable behavior."

The judge continued A.W.'s commitment and scheduled another <u>Krol</u> hearing for September 25, 2025, concluding A.W. was "entitled to one hearing a year." The October 17, 2024 order further provided for the continuation of the previously court-ordered conditions including periodic drug screening, searches for contraband and fire-setting materials, no off-site outings, taking all prescribed medications, and judicial review of the LOS should there be any future incidents.

## II.

A.W. argues he was deprived of a fair hearing in violation of his procedural due-process rights. Specifically, he alleges the judge improperly shifted the burden of proof to him, in violation of <u>Krol</u>, by stating a full hearing on the facts testified to by Drs. Baliga and Tennis would be held only if A.W. denied the allegations he had violated Greystone's policies. A.W. also claims the judge's statements evinced animus and prospective bias against him as to

7

future <u>Krol</u> hearings.  Accordingly, A.W. requests we remand for a new hearing before a different judge.

Because A.W. did not object on these grounds at the October 17, 2024 hearing, we may reject A.W.'s arguments "on this basis alone."  <u>See</u> <u>In re Civil Commitment of A.H.B.</u>, 386 N.J. Super. 16, 28 (App. Div. 2006) (citing <u>Nieder v. Royal Indem. Ins. Co.</u>, 32 N.J. 229, 234 (1973)).  However, "in the interests of justice," we may also consider plain error not raised before the trial court.  <u>R.</u> 2:10-2.  Here, we consider A.W.'s arguments under the plain-error standard "because of the personal liberty interests at stake."  <u>A.H.B.</u>, 386 N.J. Super. at 28 (citing <u>R.</u> 2:10-2).

Plain error must be "of such a nature as to have been clearly capable of producing an unjust result."  <u>R.</u> 2:10-2.  "The mere possibility of error is insufficient for reversal."  <u>N.J. Div. of Youth & Fam. Servs. v. N.S.</u>, 412 N.J. Super. 593, 622 (App. Div. 2010).  "Relief under the plain error rule, <u>Rule</u> 2:10-2, at least in civil cases, is discretionary and 'should be sparingly employed."  <u>Baker v. Nat'l State Bank</u>, 161 N.J. 220, 226 (1999) (quoting <u>Ford v. Reichert</u>, 23 N.J. 429, 435 (1957)).

A-0895-24

III.

"The scope of appellate review of a commitment determination is extremely narrow." In re Civ. Commitment of R.F., 217 N.J. 152, 174 (2014) (quoting In re D.C., 146 N.J. 31, 58 (1996)). "[A]n appellate court should not modify a trial court's determination either to commit or release an individual unless 'the record reveals a clear mistake.'" Id. at 175 (quoting D.C., 146 N.J. at 58). "An appellate court should give the 'utmost deference' to the reviewing judge's determination of the appropriate balancing of societal interest and individual liberty." In re Civ. Commitment of M.L.V., 388 N.J. Super. 454, 465 (App. Div. 2006) (quoting In re Commitment of J.P., 339 N.J. Super. 443, 459 (App. Div. 2001)).

We consider well-settled principles of law governing NGI acquittees, who "may be held in continued confinement if the person is a danger to self or others and is in need of medical treatment." In re Commitment of W.K., 159 N.J. 1, 2 (1999). The purpose is not to punish, but "to protect society against individuals who, through no culpable fault of their own, pose a threat to public safety." Krol, 68 N.J. at 246.

Once committed, NGI acquittees "are reviewed on a periodic basis under the same standards as those applied to civil commitments generally." In re

9

Commitment of M.M., 377 N.J. Super. 71, 76 (App. Div. 2005) (quoting Krol, 68 N.J. at 260) aff'd, 186 N.J. 430 (2006). "The burden for establishing the need for continued commitment is by a preponderance of the evidence, whereas in a civil commitment proceeding it is by clear and convincing evidence." W.K., 159 N.J. at 4; see also N.J.S.A. 2C:4-8(b)(3) (establishing preponderance of the evidence as standard of proof). To satisfy due-process requirements in civil commitment proceedings, the State must adhere to certain core procedural protections, including notice, the opportunity to present evidence, and representation by counsel. In re Commitment of S.L., 94 N.J. 128, 137 (1983); N.J.S.A. 30:4-27.14.

Here, the judge adhered to well-established due-process principles during the October 17, 2024 Krol hearing. A.W. received notice of the hearing, was represented by counsel, and was afforded the opportunity to cross-examine the State's witnesses. Defense counsel cross-examined Dr. Baliga, focusing in particular on his unfamiliarity with Greystone policies that A.W. did not dispute violating.

We are unconvinced the judge shifted the burden of proof to A.W. by finding a "full-blown hearing with witnesses" was required only if A.W. denied

A-0895-24

the allegations of misconduct. Because A.W. did not object at the hearing, we review this claim under the plain-error standard. R. 2:10-2.

Although the burden to prove continued dangerousness rests squarely with the State, State v. Fields, 77 N.J. 282, 300 (1978), defense counsel did not contest the facts supporting the State's assertion about A.W.'s continued dangerousness. Counsel did not assert that A.W. denied the allegations, or contest the underlying factual allegations in any other meaningful way: his cross-examination focused on the lack of documentary support for the rules themselves, not on disputing A.W.'s conduct. As a result, the judge's narrowing of the proofs at the hearing to only disputed issues was not "clearly capable of producing an unjust result." R. 2:10-2.

A.W.'s claim of judicial animus and prospective bias is likewise unavailing. Although A.W. characterizes the judge's comments, through her description of his behavior as "vicious" and decision to schedule the next hearing one year later as evidence of bias and hostility, judicial animus is not supported by the record. The judge's decision to hold another Krol after no less than a year fell within her discretion because a one-year Krol review is expressly permitted by court rule. See R. 4:74-7(f)(2) (requiring trial courts hold "periodic reviews" in A.W.'s circumstances "at least annually"); see also Fields, 77 N.J. at 303

A-0895-24

(noting "the relaxation of the restraints on the committee's liberty must proceed in gradual stages").

Moreover, trial courts are not bound to accept the recommendations of expert witnesses in Krol proceedings. See Krol, 68 N.J. at 261. Because the ultimate determination of dangerousness is a legal one, the judge is charged with balancing public safety against individual liberty. Ibid. The judge was entitled to consider A.W.'s recent conduct, including the incidents leading to his removal from the cottages, as warranting a longer rule-sanctioned review period than the experts had recommended. See N.J.S.A. 30:4–27.2(h) to (i) (requiring reviewing courts "take into account a person's history, recent behavior and any recent act, threat or serious psychiatric deterioration").

We discern no plain error in the judge's October 17, 2024 order.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-0895-24